NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5023-13T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JAMES E. GRANT, JR., a/k/a
BYRON BROWN,

 Defendant-Appellant.
_________________________________

 Submitted December 20, 2016 – Decided June 27, 2017

 Before Judges Espinosa, Suter, and Guadagno.

 On appeal from the Superior Court of New
 Jersey, Law Division, Mercer County,
 Indictment No. 12-09-0849.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Alyssa Aiello, Assistant Deputy
 Public Defender, of counsel and on the
 briefs).

 Angelo J. Onofri, Mercer County Prosecutor,
 attorney for respondent (Michael D. Grillo,
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM
 Defendant James E. Grant, Jr. appeals his convictions for the

attempted murder of two police officers sitting in their patrol

car and weapons charges following a jury trial. Among the evidence

presented at trial was a videotape that included significant

portions of inadmissible and prejudicial material, consisting of

a non-testifying witness's recital of damaging and inadmissible

hearsay statements she termed "gossip" and a detective's opinion

that defendant was guilty. Because the trial judge permitted the

videotape to be played without redaction, we are constrained to

reverse defendant's convictions.

 I.

 Defendant was indicted in September 2012 on two counts of

first-degree attempt to commit murder, N.J.S.A. 2C:11-3(a) and

2C:5-1; two counts of second-degree possession of a weapon for an

unlawful purpose, N.J.S.A. 2C:39-4(a); one count of second-degree

possession of an assault firearm, N.J.S.A. 2C:39-5(f) and 2C:39-

1(w); and one count of third-degree unlawful possession of a

weapon, N.J.S.A. 2C:58-3 and N.J.S.A. 2C:39-5(c)(1) (Indictment

No. 12-09-0849). He was convicted of all six charges following a

jury trial in 2014. Subsequently, his motion for a new trial was

denied.

 Defendant was later indicted in 2013 for second-degree

aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree

 2 A-5023-13T2
aggravated assault, N.J.S.A. 2C:12-1(b)(2); second-degree

possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-

4(a); and second-degree unlawful possession of a handgun, N.J.S.A.

2C:39-5(b), arising from an unrelated incident on May 10, 2012.

Defendant pled guilty to second-degree aggravated assault on March

13, 2014, and the other charges in that indictment were dismissed.

 Defendant was sentenced in April 2014 on his convictions

following trial and on his guilty plea to aggravated assault. For

the attempted murder and weapons charges, defendant was sentenced

to consecutive terms of fifteen years for each count of attempted

murder for an aggregate sentence of thirty years in prison with

an 85% period of parole ineligibility under the No Early Release

Act (NERA), N.J.S.A. 2C:43-7.2. He was sentenced on the weapons

counts to concurrent terms not exceeding seven years. On the

aggravated assault charge, defendant was sentenced to a concurrent

term of five years with an 85% period of parole ineligibility

under NERA.

 II.

 A.

 On May 14, 2012, near midnight, Officers Runyon and Palumbo

were patrolling in their marked police vehicle on Stuyvesant Avenue

in Trenton, near the 400 block, when they heard sounds that caused

them to unroll their windows. Within seconds, their vehicle came

 3 A-5023-13T2
under fire from what sounded like a high-powered weapon and they

sped away uninjured, radioing for back up. Subsequent

investigation revealed that five shots hit the vehicle, three of

which came very near to the officers, including one that dented

the seat back behind the officers. The police found seven .30

caliber shell casings in the vicinity of the shooting, but never

recovered the weapon.

 D.C.,1 known colloquially as "Twin," and his brother were

picked up by the police for questioning. D.C., who was seventeen

at the time, was a friend of defendant. Both D.C. and defendant

resided in the same area as the shooting. D.C. testified at trial

that defendant was upset about the recent death of Orenthia

"Pookie" Upshur, the brother of defendant's girlfriend, who died

in an automobile accident while fleeing from the police. D.C.

testified that defendant had vowed revenge against the police.

 D.C. testified that late on May 14, 2012, he stopped at

defendant's house to retrieve a pair of shoes, but defendant was

not at home. As D.C. was proceeding home, he had a chance encounter

with defendant, who he observed, despite the darkness, was kneeling

down in the yard of an abandoned house on Stuyvesant Avenue. D.C.

greeted defendant, who told him to "[s]hut the f*ck up." D.C.

1
 We use initials because D.C. was a minor at the time of the
incident.

 4 A-5023-13T2
testified defendant was holding a large rifle. When a police

vehicle came down Stuyvesant Avenue in their direction, D.C.

testified that defendant stood up, took a few steps forward, and

fired between four and eleven shots at the vehicle. D.C. followed

defendant, running from the scene, and stayed the night at

defendant's house.

 D.C. and his brother were both brought in by the police for

questioning on May 18, 2012. In the presence of his mother, D.C.

gave a videotaped statement where he described what occurred. On

the tape, D.C. claimed he only heard the shots and saw defendant

running; he did not see the rifle or defendant shooting it.

 D.C. was charged with attempted murder. He testified at

trial that after he was charged, he "ask[ed] for a lawyer and I

went to tell them the truth." D.C. gave a formal statement to the

police on June 5, 2012 in which he identified defendant as the

shooter. Defendant was arrested and charged with the shooting.2

 In addition to D.C.'s testimony, the State presented evidence

of incriminating statements made by defendant to two fellow inmates

at the Mercer County Corrections Center (the Workhouse). Defendant

was incarcerated at the Workhouse in the same cellblock as Raheem

Hickmond, who knew defendant. Hickmond testified defendant told

2
 D.C. later pled guilty to obstruction of administration of law
and received a thirty-day suspended sentence.

 5 A-5023-13T2
him about his role in the shooting and specifically that he had

"let off a shot - - a couple of shots" at the police. Defendant

told him that "Twin" was with him that night, and that Twin "was

the only one who knew about the shooting and that's how the cops

found out." Hickmond testified "that [defendant] put a hit out

on Twin" through another inmate, Willie Yeager, but it was "messed

up" when Twin's grandmother instead of Twin was shot in the arm.

Hickmond gave a formal statement to the police in November 2012.

In exchange for his testimony, the prosecutor agreed to recommend

a lighter sentence on his then pending charges.

 Terrell Black met and became friends with defendant at the

Workhouse. Black testified that defendant told him that he shot

six rounds at the police on Stuyvesant Avenue. Defendant also

told Black he was with a young boy who had braids and who apparently

had talked to the police about the shooting. Black gave a formal

statement to the police in July 2012. In exchange for his

testimony in this and other cases, the prosecutor recommended a

one-year sentence followed by probation.

 B.

 An issue arose at trial regarding the hour and one-half long

videotape of D.C.'s interrogation by the police on May 18, 2012.

Defense counsel wanted to play two excerpts from the tape, lasting

a total of five minutes, to impeach D.C.'s testimony that he had

 6 A-5023-13T2
seen defendant shoot at the police. The prosecutor asserted the

tape was more of a discussion than an interrogation, because D.C.'s

mother made a number of comments on the tape. The prosecutor took

the position that the entire video had to be shown, citing to

N.J.R.E. 106. Without viewing the videotape, the judge said,

 [COURT]: I would prefer the entire video be
 shown because I would imagine that even if you
 did show part of it, he is going to want to
 go and bring the other part in . . . . [T]he
 preference is always to play it in its
 entirety.

After learning the video was long and there was no written

transcript of it, the court stated,

 [COURT]: I'm not saying you can't — look, you
 handle it how you want. If you want to play
 certain portions of it, he is going to do the
 other parts; okay?

Defense counsel expressed concern because D.C.'s mother could be

heard on the tape but was not going to be called as a witness at

trial.

 [DEFENSE]: She . . . says things that are
 detrimental to my client on there. I think
 that should never be allowed because she's not
 a witness.

 Defense counsel wanted to impeach D.C. with his prior

inconsistent statements and acknowledged she could use the tape

or "just ask him these questions, if he denied them, then play

it." But the prosecutor reiterated that,

 7 A-5023-13T2
 [STATE]: [T]he problem for the State is now,
 Judge, how do I go about and now parcel out
 with the video what statement — exclude the
 [illegible] of the mother or whatever that she
 claims is prejudicial to her client? I can't
 do that now in the middle of a trial.

 Defense counsel told the judge she had taken out the comments

by D.C.'s mother, but the State continued to assert its position

of playing the entire tape and the court vacillated.

 [DEFENSE]: I went through and . . . every time
 the mom interrupted I took her part out. She
 is not relevant to this case. She is not a
 part of this case. She is not a witness to
 anything so whatever she says or doesn't say
 should not be put in front of the jury.

 . . . .

 [STATE]: All I am saying, Judge, is, is that
 I don't know what she is talking about in
 regards to, I don't know what the State is
 going to play or the State is going to show.

 . . . .

 [COURT]: Here is what we're stuck doing. What
 we're stuck doing . . . is you playing the
 excerpts; okay? I am going to assume, based
 on your representation, that the excerpts that
 you're going to play deal specifically with
 the testimony provided by [D.C.] either in
 court under examination by [the prosecutor]
 or with regards to the statements that were
 addressed in court.

 . . . .

 [STATE]: [T]he State is going to intend on
 playing the rest of this video, Judge, and I
 don’t know how we're going to get around it.

 8 A-5023-13T2
 [COURT]: All right.

 . . . .

 [DEFENSE]: I just want to reiterate my
 objection to the mother's voice — I know there
 is nothing Your Honor can do, but I just want
 to put the objection on the record; that's
 all.

 [COURT]: All I want to know is what are we
 doing with this tape; are we playing it in
 full, in half, in part? Just tell me.

 [STATE]: You can't have your cake and eat it,
 too. If you're going to put portions in, then
 the State is going to put the rest of the
 portions in so do you want the full tape in
 or do you not want it in?

 [COURT]: How do you want to handle it?

 [DEFENSE]: I mean, I would rather put in my
 parts. I put in 15:08 to 16:12. I am talking
 about a time. And then I restart at 16:12:20
 to 16:12:47 and then stop.3

 [COURT]: Sure. Look, if that's how you want
 to proceed, I have no problem with that. I
 want you to handle your case the same way I
 want you to handle your case, the way you want
 it. It is not an issue with me.

 Defense counsel pressed the court for clarification.

 [DEFENSE]: My question, I guess, going forward
 is, if I make this effort, going through it
 like this, is the State then going to be
 allowed to play the entire missing parts? If

3
 The tape started at 15:56 and ended at 17:50, referencing
military time. Defense counsel wanted to play the tape starting
at 16:08 to 16:12, which is where D.C. describes the events after
he encountered defendant on Stuyvesant Avenue.

 9 A-5023-13T2
 they are, then let's just play the whole
 thing.

 [COURT]: Well, for completeness, they are
 going to, but any statements that — any
 outbursts that the mother may make are going
 to have to be excised.

The State reiterated that D.C.'s mother was "an integral part of

the conversation" and that she could not be taken out "and get a

full completeness of what is being said in that room." The court

responded,

 [COURT]: Look, the best that the Court can do
 is just hear the evidence, respond to the
 objections and you're in control of the — of
 your own respective evidence. And if it blows
 up on you, I will try to clean up the mess,
 but that is not my job.

 The State then suggested that the situation could be addressed

by a curative instruction regarding any statements on the tape by

D.C.'s mother saying that "it is not evidence in the case, the

jury should not consider it in any way whatever[.]" Defense

counsel seemed persuaded.

 [DEFENSE]: We're making almost a joint
 decision to play the whole tape anyway. Since
 it is going to be played anyway, it doesn't
 make sense –

 [COURT]: I'm fine - if you want to play the
 whole thing and if you want to play the whole
 thing, I am fine with it, you know.

 [DEFENSE]: I am not going to object to
 anything in the tape, but I would like that
 curative instruction at the end and I would

 10 A-5023-13T2
 like it to be a Court exhibit, not a Defense
 exhibit, as well.

 When the court would not agree to mark the tape as a court

exhibit, it was marked as a joint exhibit by the parties. The

court then advised counsel:

 [COURT]: I am sure nobody has anything to
 hide, but if you, if you're coming up on a
 part that you know that [D.C.'s mother] is
 going to say something really inflammatory,
 just skip it.

 [DEFENSE]: There are so many parts where she
 says things, it's hard to — literally, every
 stop and start is because mom is interrupting,
 mom is interrupting, mom is interrupting, so
 I think it is going to be difficult to pinpoint
 one thing and if we have a curative
 instruction, I think that is the best.

 Before playing the entire tape, the judge gave the following

instruction to the jury.

 [COURT]: Folks, we have — what is being
 presented to you at this point is a CD or DVD
 of a recording of a statement provided by
 [D.C.] subsequent to when he first came down
 to talk to the police, but prior to his being
 charged; okay? . . . [T]here are going to be
 some remarks or responses or some verbiage
 that you're going to hear from [D.C.]'s
 mother. And at the consent of the attorneys
 in this case, I need to advise you, first,
 that anything you hear that the mother may say
 has to be disregarded by you as hearsay, as
 being unreliable, not subject to cross-
 examination and cannot be considered by you
 in any way, shape or form in your decision-
 making process as to whether or not the State
 has met its burden in proving the charges
 against Mr. Grant so to the extent that you

 11 A-5023-13T2
 can, disregard, but note that you can't use
 anything that she said.

 For the most part, the dialogue you should
 focus . . . on is between the officer doing
 the questioning and [D.C.] in giving the
 responses.

 [(Emphasis added).]

 C.

 Three people could be seen and heard on the videotape: D.C.,

his mother and Detective Britton, who later testified at trial.

On the tape, D.C. acknowledged his chance encounter with defendant,

but stated that as he was walking away toward his own home, he

heard shots ring out close by, turned toward defendant, and saw

him running. D.C. then turned and ran in the opposite direction

from defendant, toward his own home. When he arrived, the house

was locked. He spent the night at his girlfriend's house nearby.

 The detective questioned D.C. about his sequencing of events

and how D.C.'s timeframes presented problems with his story. He

told D.C. that the shooting was being attributed to him.

 The detective told D.C. repeatedly that "the streets were

talking" and those "streets" were saying that D.C was involved.

 [DETECTIVE]: We've brought in enough people.
 We've come to sort of an idea about what
 happened out there. . . . The streets put the
 right people in the right spot. . . . People
 know you were there. . . . People have put you
 guys together out there.

 12 A-5023-13T2
And then:

 [DETECTIVE]: Everybody on the street isn't
 saying Ski,4 they saying Twin.

 [MOTHER]: They scared of Ski or something that
 they don't tell the truth. . . . I heard some
 gossip . . . . I heard something else about
 Ski. . . . There's a rumor saying, I don't put
 nobody's name on it, that [defendant] did it.
 This is between me and you [indicating the
 detective] . . . that he did it.

 . . . .

 [DETECTIVE]: This is what I'm trying to get
 to. Your mom knows the streets. . . . You're
 the only ones around. By the next morning,
 when this happens everyone thinks it's the
 craziest, baddest dude on the block
 [indicating defendant]. Then as the day goes
 on, it becomes [you].

The interview continues:

 [MOTHER]: What I heard today, three people
 came up to me and told me . . . that
 [defendant] was bragging about what he did.
 And that he's never going to be caught. . . .
 And all he was bragging about it, bragging
 about it, bragging about it. . . . Let me tell
 you what I heard about Ski today. . . . I
 thought he was a nice guy. . . . But what I
 heard today, you gotta watch it with him. . .
 . And I know he did it. . . . He say that he
 did it. He told three people. . . . And they
 said there's a lot of people out there that's
 scared, that Ski got a lot of people wrapped
 around his finger.

 [(Emphasis added).]

4
 Defendant is known by the street name "J-Ski."

 13 A-5023-13T2
 The detective said "somebody is talking correctly. The people

that were in that deli were taking correctly. Whatever they were

saying, we followed it up and they were correct." At another

point the detective said: "Somebody says that they heard you say

you were out there and that you talked. This is some of the

evidence." "I have somebody that is going to stand up and say I

heard [D.C.] say this." At the end of the video, D.C. stated,

"I'm sure he did it; sure he did it." The detective replied, "I'm

sure he did it, you're sure he did it, we're all sure he did it.

I wasn't there and she wasn't there," and stated further,

"[u]nfortunately we have witnesses that put you there and put him

there."

 D.

 Defendant appeals his convictions raising the following

issues on appeal:

 POINT I. IN LIGHT OF THE GRAVE DANGER OF
 WRONGFUL CONVICTION POSED BY INHERENTLY
 UNRELIABLE JAILHOUSE SNITCH TESTIMONY, ITS
 INTRODUCTION AT TRIAL IS INCOMPATIBLE WITH THE
 DUE PROCESS RIGHTS GUARANTEED UNDER THE NEW
 JERSEY CONSTITUTION, AND THUS, THE STATE'S
 HEAVY RELIANCE ON SUCH TESTIMONY IN THIS CASE
 REQUIRES REVERSAL OF GRANT'S CONVICTIONS. IN
 THE ALTERNATIVE, REVERSAL IS REQUIRED BECAUSE
 THE COURT FAILED TO HOLD A PRETRIAL HEARING
 ON THE RELIABILITY OF THE JAILHOUSE SNITCH
 TESTIMONY AND FAILED TO PROPERLY INSTRUCT THE
 JURY ON HOW TO EVALUATE SUCH TESTIMONY. (Not
 Raised Below)

 14 A-5023-13T2
 POINT TWO. THERE WAS NO EVIDENTIARY BASIS FOR
 THE INTRODUCTION OF [D.C.]'S TWO-HOUR
 VIDEOTAPED INTERVIEW DURING WHICH DETECTIVE
 BRITTON AND [D.C.]'S MOTHER, WHO WAS NOT A
 WITNESS AT TRIAL, MADE NUMEROUS STATEMENTS,
 BASED ENTIRELY ON INFORMATION RECEIVED FROM
 NON-TESTIFYING WITNESSES, ABOUT GRANT'S
 GUILT. THE INTRODUCTION OF THIS PREJUDICAL
 [sic] VIDEOTAPE VIOLATED THE PROHIBITION
 AGAINST HEARSAY AND GRANT'S RIGHT TO
 CONFRONTATION, AND REQUIRES REVERSAL OF
 GRANT'S CONVICTIONS.

 A. The Doctrine of Completeness Did not
 Apply.

 B. The Inadmissible Hearsay Statements
 Contained In the Videotape Violated Grant's
 Right to Confrontation.

 C. Reversal is Required.

 POINT III. REPEATED INSTANCES OF
 PROSECUTORIAL MISCONDUCT DENIED GRANT DUE
 PROCESS AND A FAIR TRIAL (Partially Raised
 Below)

 A. The Prosecutor Improperly Bolstered
 The Credibility Of The State's Witnesses.

 B. The Prosecutor Improperly Shifted The
 Burden Of Proof To The Defense.

 C. The Prosecutor Improperly Suggested
 That Grant Was A Gang Member.

 POINT IV. IN THE EVENT OF REVERSAL, GRANT
 SHOULD BE PERMITTED TO WITHDRAW HIS GUILTY
 PLEA UNDER INDICTMENT NO. 13-02-0248.5

5
 Defendant did not make a motion to withdraw his guilty plea in
the trial court pursuant to Rule 3:9-3(e). As a result there is
no order that is subject to review on appeal, R. 2:2-3. This
issue is not, therefore, properly before us.

 15 A-5023-13T2
 III.

 The argument defendant raises in Point II requires us to

review the trial court's evidentiary ruling to permit the

unredacted videotape to be introduced into evidence. We grant

substantial deference to the trial judge's discretion on

evidentiary rulings unless it is a clear error of judgment or so

wide of the mark that a manifest denial of justice results. See,

e.g., State v. Koedatich, 112 N.J. 225, 313 (1988), cert. denied,

488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989); State v.

Carter, 91 N.J. 86, 106 (1982); State v. Swint, 328 N.J. Super.

236, 253 (App. Div.), certif. denied, 165 N.J. 492 (2000).

 A.

 Defendant contends that playing the entire videotaped

interview of D.C. violated his Sixth Amendment right to

confrontation and the prohibition against hearsay. D.C.'s mother

was never called as a witness at trial. Defendant had no ability

to cross-examine her about her statements that indicated defendant

was guilty. Moreover, although the judge gave a curative

instruction prior to playing the videotape, defendant contends it

was inadequate to address his inability to confront the witness

on cross-examination.

 The State does not dispute that defendant's right of

confrontation was implicated by showing the entire tape to the

 16 A-5023-13T2
jury. The State contends that the doctrine of invited error bars

defendant from contending it was error to play the full videotape

to the jury, because defendant chose to play the entire tape to

the jury, even though the court had not definitively ruled on the

issue. Additionally, the State contends the curative instruction

was sufficient to blunt any Confrontation Clause violation. We

disagree with both contentions.

 Both the Sixth Amendment of the United States Constitution

and Article I, Paragraph 10 of the New Jersey Constitution provide

that the accused in a criminal prosecution has the right "to be

confronted with the witnesses against him." U.S. Const. amend.

VI; N.J. Const. art. I, ¶ 10. "These constitutional provisions

express a clear preference for the taking of testimony subject to

cross-examination." State v. Cabbell, 207 N.J. 311, 328 (2011)

(citing State ex rel. J.A., 195 N.J. 324, 342-43 (2008)).

"Because '[t]he right of confrontation is an essential attribute

of the right to a fair trial,' a defendant must be given 'a fair

opportunity to defend against the State[']s accusations.'" State

v. Basil, 202 N.J. 570, 590-591 (2010) (alterations in original)

(quoting State v. Branch, 182 N.J. 338, 348 (2005)).

 "The opportunity to cross-examine a witness is at the very

core of the right of confrontation." Cabbell, supra, 207 N.J. at

328 (citing California v. Green, 399 U.S. 149, 158, 90 S. Ct.

 17 A-5023-13T2
1930, 1935, 26 L. Ed. 2d 489, 497 (1970)). The Confrontation

Clause prohibits the use of a witness's out-of-court testimonial

hearsay statement when a defendant has not had the opportunity to

cross-examine the witness. J.A., supra, 195 N.J. at 342. "[A]

statement made to the police is testimonial when it is given in

'circumstances objectively indicat[ing] that . . . the primary

purpose of the interrogation is to establish or prove past events

potentially relevant to later criminal prosecution.'" Cabbell,

supra, 207 N.J. at 329 (alterations in original) (quoting Davis

v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74, 165

L. Ed. 2d 224, 237 (2006)).

 If the witness is absent from trial, a testimonial statement

is admissible only where that witness "is unavailable, and . . .

the defendant has had a prior opportunity to cross-examine."

Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369,

158 L. Ed. 2d 177, 197 (2004). "The [Confrontation] Clause does

not bar admission of a statement so long as the [witness] is

present at trial to defend or explain it." Cabbell, supra, 207

N.J. at 329 (alterations in original) (quoting Crawford, supra,

541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9, 158 L. Ed. 2d at 197

n.9).

 "The government bears the burden of proving the

constitutional admissibility of a statement in response to a

 18 A-5023-13T2
Confrontation Clause challenge." Basil, supra, 202 N.J. at 596.

The violation of a defendant's Sixth Amendment right to

confrontation "is a fatal error, mandating a new trial, unless we

are 'able to declare a belief that it was harmless beyond a

reasonable doubt.'" Cabbell, supra, 207 N.J. at 338 (quoting

Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.

Ed. 2d 705, 710-11 (1967)).

 Here, the Confrontation Clause was clearly violated when the

court permitted the entire videotape to be played to the jury,

because it included statements by D.C.'s mother. She was not

called as a witness. There was no indication that she was

unavailable for trial. Defendant had no prior ability to cross-

examine her. Because this violation, admitted by the State,

constitutes a "fatal error," a new trial is mandated unless we

determine the error was "harmless beyond a reasonable doubt."

Ibid.

 B.

 In making this determination, we first examine the statements

made by D.C.'s mother that defendant sought to redact.

Specifically, D.C.'s mother said she had heard certain things

about the defendant. She related that defendant "told three

people" that he "did it"; he "was bragging about what he did[,]

and that he's never gonna get caught"; and he had someone "talk

 19 A-5023-13T2
[to one of the detectives], [and say] it was the twins . . . [a]nd

that way the person can get the [reward] money and give it to

[defendant]." D.C.'s mother also said that "there's a lot of

people out there that's scared" of [defendant]. She also expressed

to the detective "then, you know, my house start getting shot up."

 We agree with defendant that these statements all were

inadmissible hearsay. D.C.'s mother was not called as a witness

at trial; she was testifying about what others said, who also were

not called as witnesses at trial. This testimony clearly was

prejudicial. The statements by D.C.'s mother indicated that

defendant had confessed, was to be feared, and was violent.

 The error in failing to redact the inadmissible statements

by D.C.'s mother was compounded, rather than cured, by the

instruction the judge gave to the jury. Although telling the jury

that D.C.'s mother's testimony should be ignored entirely, this

direction at the same time was qualified. The jury was instructed

to disregard what the mother said "to the extent that you can,

disregard," and that they should focus on the dialogue between

D.C. and the officer "for the most part." Moreover, there was no

additional mention of the curative instruction in the judge's

charge to the jury following summations.

 The error in the court's evidentiary ruling was further

exacerbated by an incorrect ruling on a defense objection during

 20 A-5023-13T2
the State's closing statement. The prosecutor referenced the

mother's statement in the videotape by saying, "[a]nd what is

interesting is his mother during the interview says, I'm afraid

they are going to shoot up my . . . ." Defense counsel objected,

reminding the judge that the jury had been "told to disregard her

testimony, her statements," but defense counsel was overruled.

This ruling effectively negated what was already a token effort

to ameliorate the prejudice from D.C.'s mother's statements.

 C.

 At trial, defendant did not ask the court to redact the

statements made by Detective Britton from the videotape. We

consider them here, however, as essential pieces of the context

for our review of the evidentiary ruling.

 In the unredacted videotape, the detective made numerous

statements in which he vouched for the correctness of the

statements made by people on the streets and expressed his own

belief in defendant's guilt. Responding to D.C.'s mother's

statements about what was being said on the street, the detective

confirmed that people thought defendant did the shooting, that he

was "the craziest, baddest dude on the block," and that their

beliefs were correct. Those statements included "The streets put

the right people in the right spot" and "somebody is talking

correctly. The people that were in that deli were taking

 21 A-5023-13T2
correctly. Whatever they were saying, we followed it up and they

were correct." And, most damaging, the detective expressed his

personal conviction that defendant was guilty: "I'm sure he did

it, you're sure he did it, we're all sure he did it."

 The admission of these statements was wholly improper. The

detective's references to defendant's reputation as "the craziest,

baddest dude on the block" constituted evidence of other bad

conduct that was presented to the jury without any assessment of

its admissibility pursuant to N.J.R.E. 404(b) and the factors set

forth in State v. Cofield, 127 N.J. 328, 338 (1992). "Other-

crimes evidence is considered highly prejudicial," State v.

Vallejo, 198 N.J. 122, 133 (2009), having "a unique tendency to

turn a jury against the defendant[,]" State v. Hernandez, 334 N.J.

Super. 264, 269-70 (App. Div. 2000), aff'd as mod., 170 N.J. 106

(2001), quoting State v. Stevens, 115 N.J. 289, 305-06 (1989).

That effect was undoubtedly exacerbated by the detective's

expression of his personal opinion that defendant was guilty. See

State v. Landeros, 20 N.J. 69, 74-75 (1955) (testimony at trial

by Police Captain that defendant was "as guilty as Mrs. Murphy's

pet pig" was so prejudicial that "fundamental fairness" required

reversal of defendant's conviction.) Even without any objection

or request from the defendant, the highly prejudicial nature of

these comments required action by the trial judge.

 22 A-5023-13T2
 D.

 For the first time on appeal, defendant contends that

Detective Britton's testimony at trial also violated the

Confrontation Clause by referring to an out-of-court witness. At

trial, Britton was asked:

 [STATE]: Based on information received in
 that conversation, did you develop a potential
 suspect in this case?

 [DETECTIVE]: In part and parcel to the other
 information, yes.

 [STATE]: Who was that?

 [DETECTIVE]: [D.C.]

 [STATE]: Later that day at 8:30 p.m. did you
 develop additional information related to your
 investigation?

 [DETECTIVE]: Yes.

 [STATE]: Based on that information, did you
 develop another suspect in your investigation?

 [DETECTIVE]: Yes.

 [STATE]: Who was that?

 [DETECTIVE]: James Grant.

 "[B]oth the Confrontation Clause and the hearsay rule are

violated when, at trial, a police officer conveys, directly or by

inference, information from a non-testifying declarant to

incriminate the defendant in the crime charged." Branch, supra,

 23 A-5023-13T2
182 N.J. at 350. The right is also violated where an officer

"impl[ies] to the jury that he possesses superior knowledge,

outside the record, that incriminates the defendant." Id. at 351.

However, "[i]t is well settled that the hearsay rule is not

violated when a police officer explains the reason he approached

a suspect or went to the scene of the crime by stating that he did

so 'upon information received.'" State v. Bankston, 63 N.J. 262,

268 (1973) (citation omitted). However,

 [i]n contexts other than a photographic
 identification, the phrase "based on
 information received" may be used by police
 officers to explain their actions, but only
 if necessary to rebut a suggestion that they
 acted arbitrarily and only if the use of that
 phrase does not create an inference that the
 defendant has been implicated in a crime by
 some unknown person.

 [Branch, supra, 182 N.J. at 352.]

 There was no suggestion that Detective Britton had acted

arbitrarily or with ill motive. At trial, the detective indicated

he "developed information," and he did not indicate that

information came from an unidentified informant or witness.

However, on the videotape, Detective Britton specifically said

that he had someone who could put both D.C. and defendant at the

location. He also said that he knew defendant was guilty. He

referenced multiple times that the "streets were talking" and the

"people in the deli" were talking. These statements implied that

 24 A-5023-13T2
the detective had one or more out-of-court witnesses that put

defendant at the scene, and that the detective believed defendant

was guilty based on that knowledge. This is the type of inference

of superior knowledge that is not permitted under Branch or

Bankston.

 E.

 Having reviewed the video statement within the context of

trial as a whole, we cannot say that the introduction of the video

statement was "harmless beyond a reasonable doubt." Chapman,

supra, 386 U.S. at 24, 87 S. Ct. at 828, 17 L. Ed. 2d at 710-11;

see also State v. Taffaro, 195 N.J. 442, 454 (2008) (noting that

the standard for plain error is whether the error was "sufficient

to raise a reasonable doubt as to whether the error led the jury

to a result it otherwise might not have reached" (quoting State

v. Macon, 57 N.J. 325, 336 (1971))). All the witnesses were

cooperating with the State for more favorable sentences. There

was no physical evidence that tied defendant to the crimes. There

was testimony that "[m]any, many [witnesses] fear retaliation. It

is a big problem[,]" and that defendant in fact had retaliated by

arranging to have someone shoot D.C., but that his grandmother was

shot instead. The detective indicated he had superior knowledge

from out-of-court witnesses, but the implication was that those

 25 A-5023-13T2
witnesses may be afraid to come forward. Defendant had no ability

to confront this implication.

 On this record, "the possibility of injustice" by playing the

tape was "sufficient to raise a reasonable doubt as to whether the

error led the jury to a result it otherwise might not have

reached[.]" Taffaro, supra, 195 N.J. at 454 (quoting Macon, supra,

57 N.J. at 336. Thus, we are constrained to conclude that the

Confrontation Clause was violated by playing the entire tape,

which had the clear capacity to cause an unjust result by

corroborating through out-of-court witnesses the testimony of

those who did testify. We are therefore compelled to overturn

defendant's convictions and remand for a new trial.

 F.

 We also reject the State's argument that defendant's

contention is barred as invited error. The defense sought to play

very limited excerpts of the tape for the specific purpose of

impeaching D.C.'s testimony with his prior inconsistent statement

pursuant to N.J.R.E. 607. It was the State that objected to that,

indicating that the whole tape had to be played because the taped

interview was more in the nature of a discussion rather than an

interrogation. Although contending the whole videotape had to be

played, the State failed to articulate how any additional portion

 26 A-5023-13T2
of the videotape was required to be admitted "in fairness" as

permitted by N.J.R.E. 106.

 The doctrine of invited error operates to bar a "disappointed

litigant" from arguing on appeal that an adverse decision below

was the product of error, "when that party urged the lower court

to adopt the proposition now alleged to be error." State v.

Munafo, 222 N.J. 480, 487 (2015) (quoting State v. A.R., 213 N.J.

542, 561 (2013)). The doctrine "is implicated only when a

defendant in some way has led the court into error," State v.

Jenkins, 178 N.J. 347, 359 (2004), "while pursuing a tactical

advantage that does not work as planned." State v. Williams, 219

N.J. 89, 100 (2014) (citation omitted). "The doctrine of invited

error 'is based on considerations of fairness and preservation of

the integrity of the litigation process.'" N.J. Div. of Youth &

Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett

v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996)). "Some

measure of reliance by the court is necessary for the invited-

error doctrine to come into play." Jenkins, supra, 178 N.J. at

359.

 Although it was error to play the entire tape, it was not

invited error by defense counsel. The State asked for the entire

tape to be played to the jury, not the defense. We disagree that

defense counsel's eventual capitulation, given the State's

 27 A-5023-13T2
position and indecision by the court, is the type of error

contemplated by the invited error doctrine. There was no apparent

tactical advantage to the defense given the comments by D.C.'s

mother that incriminated defendant. Playing the whole tape was

prompted by the State, which at the end asked for a curative

instruction. Although the State contends the court did not

indicate any preliminary ruling, the court stated repeatedly it

was inclined to play the whole tape given the State's assertion

this was the only way the tape could be handled. In a situation

such as this, the court should have taken the time to listen to

the tape in order to make a proper ruling. It was not sufficient

for the court to simply allow the parties to do what they wanted

and then "clean up" afterwards.

 IV.

 We comment briefly on the other issues raised on appeal.

Defendant contends that his right to due process was violated by

the "inherent unreliability" of "jailhouse snitch testimony"

offered by the testimony of Hickmond and Black. However, the

Supreme Court has considered this question and determined that the

federal constitution does not bar the introduction of such

evidence. See Kansas v. Ventris, 556 U.S. 586, 594, 129 S. Ct.

1841, 1847, 173 L. Ed. 2d 801, 809 (2009). Defendant offers no

support for the proposition that such testimony should be barred

 28 A-5023-13T2
under our Constitution. Moreover, there was evidence here that

the testimony of Hickmond and Black was corroborated by extrinsic

details and by the timing of their statements.

 The court provided the jury with the cooperating witness

charge. See Model Jury Charge (Criminal), "Testimony of a

Cooperating Co-Defendant or Witness" (2006). Additionally, it

instructed the jury on credibility. These instructions were more

than adequate to address the potential credibility issues raised

by the testimony of a cooperating witness. Thus, there was no

error in permitting the testimony of cooperating witnesses, nor

in the charge that was given to the jury about those cooperating

witnesses.

 Defendant contends that the prosecutor bolstered the

credibility of the witnesses through testimony and in summation

that described the process for evaluating whether to use

cooperating witness testimony. "It is within the sole and

exclusive province of the jury to determine the credibility of the

testimony of a witness." State v. Vandeweaghe, 351 N.J. Super.

467, 481 (App. Div. 2002), aff’d, 177 N.J. 229 (2003). "A

prosecutor may argue that a witness [should be found] credible,

so long as the prosecutor does not personally vouch for the

witness's credibility or refer to matters outside the record as

support for the witness's credibility." State v. Walden, 370 N.J.

 29 A-5023-13T2
Super. 549, 560 (App. Div.), certif. denied, 182 N.J. 148 (2004);

State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div.), certif.

denied, 151 N.J. 466 (1997).

 Because defense counsel did not timely object, this weighs

against a finding of prosecutorial misconduct. State v. Echols,

199 N.J. 344, 360 (2009) ("Failure to make a timely objection

indicates that defense counsel did not believe the remarks were

prejudicial at the time they were made." (quoting State v.

Timmendequas, 161 N.J. 515, 576 (1999))). The criticized line of

questioning did not constitute a personal voucher for the jailhouse

witnesses but related to the process used for verification.

Moreover, another comment made in closing about the detective's

fairness did not vouch for his truthfulness.

 There was no improper shifting of the burden of proof as

alleged by defendant when the prosecutor commented, without

objection, about a newspaper article that was referenced by the

defense. The State did not suggest defendant had an obligation

to produce the newspaper, but merely "revealed [a] gap[] in the

defense's case." Timmendequas, supra, 161 N.J. at 593.

 Similarly, there was no improper reference to gang

membership. The court was careful to avoid all reference to this

and cautioned counsel to avoid that issue. We are not persuaded

that the one isolated reference in the State's summation to a

 30 A-5023-13T2
"professional shooter" over the course of a multiday trial was

error.6 None of these statements were "of such a nature as to

have been clearly capable of producing an unjust result[.]" R.

2:10-2.

 Defendant's convictions under Indictment No. 12-09-0849 are

reversed and remanded for a new trial.

6
 Although defense counsel objected to a power point presentation,
which was playing simultaneously, because it used the word
"associate," there was no actual objection to the phrase
"professional shooter."

 31 A-5023-13T2