827 A.2d 1028

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. PETER
VANDEWEAGHE, DEFENDANT–RESPONDENT.

Argued April 29, 2003—Decided July 21, 2003.

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Ms. Hulett* and *Wendy Alice Way,* Deputy Attorney General, of counsel and on the briefs).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

The opinion of the Court was delivered by

ZAZZALI, J.

In this appeal we must determine whether the admission of irrelevant and highly prejudicial evidence that defendant suffered from antisocial personality disorder was justified on the ground that defendant "opened the door" in his intoxication defense to murder.

This matter arose after several individuals witnessed defendant Peter Vandeweaghe kick his female companion to death in Atlantic City. Defendant claimed that at the time of the incident he was incapable of forming the requisite *mens rea* for purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1), (2), due to severe, self-induced intoxication. Defendant and the State each presented a forensic psychologist to testify regarding defendant's intoxication and its impact on his ability to act purposely or knowingly. In addition, each expert presented conflicting testimony concerning whether defendant suffered from antisocial personality disorder.

We conclude that the expert testimony in respect of antisocial personality disorder was inadmissible. We also find that the State's expert's testimony regarding that disorder was so prejudicial that it clearly had the capacity to produce an unjust result and, for that reason, denied defendant the right to a fair trial. We therefore affirm.

I

A

The facts established at trial are detailed in the decision of the Appellate Division, *State v. Vandeweaghe*, 351 *N.J.Super.* 467, 470–76, 799 *A.2d* 1 (2002), and are incorporated herein as if more fully set forth. We provide the following summary.

Defendant, a forty-six-year-old homeless, unemployed alcoholic, was living on the streets of Atlantic City in 1998. In April or May of that year defendant met Penny Lacomchek, who also was homeless and an alcoholic. The couple pooled their resources to purchase alcohol, clothes, and occasional shelter.

On July 24, 1998 at approximately 9:50 p.m., Atlantic City Police Officers Dennis McGee and Michael Ruzzo were dispatched to the Flamingo Motel to investigate a report of "a male beating a female." There, the officers encountered Lacomchek sitting at the top of a motel staircase and defendant standing about ten feet away from her. McGee testified that he did not observe any

"fresh" injury to Lacomchek, but asked whether she wanted to sign a complaint or go to the hospital. She declined both offers. McGee and Ruzzo then requested that defendant and Lacomchek leave the premises.

Shortly thereafter, several individuals witnessed defendant repeatedly kick Lacomchek in the head in front of the Howard Johnson Hotel in Atlantic City. Gerome Neal, a bell captain at the hotel, testified that a young male came into the hotel and asked him to call the police because someone was "getting beat up across the street." Neal requested that the front desk manager call the police. Another young male and an elderly couple then came into the hotel and asked the hotel staff to call the police because a man was kicking a woman.

At approximately 10:25 p.m., Officer McGee was dispatched to the Howard Johnson. He testified that on arriving he saw defendant standing over Lacomchek and kicking her in the shoulder. As he approached the couple, McGee observed defendant pulling on Lacomchek's arm and "telling her to get up." He indicated that Lacomchek's face was "all puffed up" and that her "eyes were closed." McGee placed defendant under arrest and read him his *Miranda* warnings. Lacomchek was transported to the hospital, where she later died from cerebral compression as a result of acute subdural hemorrhaging, most likely due to blunt force trauma to the head. The State charged defendant with purposeful or knowing murder, pursuant to *N.J.S.A.* 2C:11–3a(1), (2).

### B

At trial, defendant admitted kicking Lacomchek, but claimed that his faculties were so prostrated due to self-induced intoxication that he was incapable of acting purposely or knowingly. He stated that he recalled being in front of the Howard Johnson Hotel with Lacomchek, and recalled slapping her, but did not remember kicking her. He also remembered wrestling with Lacomchek over a bag that contained bottles of alcohol, and thought

that Lacomchek bumped into a parked truck and fell to the ground. Defendant also testified that he remembered being hand-cuffed, taken away by the police, and then falling asleep in jail.

In support of his intoxication defense, defendant offered the testimony of Dr. Gary Glass, a forensic psychiatrist. Dr. Glass first diagnosed defendant as suffering from longstanding and severe alcohol addiction and related medical problems. Dr. Glass then stated that on the night that defendant kicked Lacomchek to death defendant "was so overwhelmed by his alcohol intoxication that he was ... not able to form the intent to kill ... or to cause serious bodily injury." In reaching that conclusion, Dr. Glass considered defendant's sudden and severe alcohol withdrawal symptoms after he was placed in jail, the fact that defendant fell asleep in jail shortly following his arrest, defendant's inability to recall certain facts, defendant's and other witnesses' statements regarding the quantity of alcohol consumed by defendant preced-ing the offense and the frequency with which he consumed it generally. He also considered witnesses' perception of defen-dant's behavior, including his lack of coordination, slurred speech, and disparate and acute shifts in disposition on the night of the offense.

Dr. Glass also commented on a pretrial expert report authored by the State's expert, Dr. Michael Welner. That report set forth Dr. Welner's opinion that defendant suffered from antisocial per-sonality disorder. Dr. Glass testified that intoxication precludes a diagnosis of antisocial personality disorder and that Dr. Welner's conclusion that defendant suffered from that disorder was incor-rect.

Dr. Welner then testified on behalf of the State. In respect of defendant's claim of severe intoxication at the time of the offense, Dr. Welner concluded that because defendant suffered from alco-hol addiction, defendant could function better when he consumed the amount of alcohol to which his body had become accustomed. He noted that defendant did not exhibit signs of random or disorganized behavior consistent with severe intoxication on the

night of the offense. Further, Dr. Welner questioned defendant's ability to recall only a select portion of the events on the night of the offense, indicating that an alcohol-induced blackout usually lasts for a few hours and involves "a lack of recall of everything." Because he believed defendant was not unduly influenced by alcohol, Dr. Welner concluded that defendant acted purposely or knowingly when he repeatedly kicked Lacomchek.

In addition to that conclusion, Dr. Welner testified that defendant suffered from antisocial personality disorder. When asked whether his diagnosis of that disorder affected "cognition or the ability of one to know what is happening or to act purposefully on a particular occasion," Dr. Welner responded: "No, it would not[,][but] it would make him especially likely to be able to act in his own interest, because that's part of what makes an antisocial person an antisocial personality."

Dr. Welner discussed the characteristics of antisocial personality disorder:

[The] failure to conform to social norms with respect to lawful behaviors by doing things repeatedly that would result in arrest. Basically doing a lot of illegal things, one. Lying, two. Impulsivity or just doing things without looking forward to the consequences, three. Irritability and aggressiveness, four. Reckless disregard of one's own safety or the safety of others, five. Consistent irresponsibility, irresponsibility about a job, irresponsibility about money, irresponsibility about parental obligations. And a lack of remorse, seven, either by being indifferent to the hurt or pain that you cause others or just rationalizing and making excuses.

Relying on his interview with defendant, police accounts of the night of the offense, and witnesses' statements, as well as statements made by several individuals that had interacted with defendant in the past, Dr. Welner concluded that defendant's personality conformed to those criteria.

Dr. Welner then discussed in greater detail the events in defendant's history that he relied on in reaching his diagnosis. He stated that defendant told him that after he was drafted for military service, he became involved with an exotic dancer, took on her name, and "disappeared" until he was arrested for burglary. Defendant also informed Dr. Welner that he had served time in prison for larceny, and then relocated to Illinois. Dr. Welner

further testified that he had interviewed several individuals that had come into contact with defendant in Illinois, and learned that defendant had engaged in lying, gambling, stealing, womanizing, and abusing alcohol. As a result of his interviews, Dr. Welner determined that defendant had a history of alcohol and intravenous drug abuse, as well as a record of "lawbreaking," that included "numerous arrests."

Dr. Welner then testified that defendant's past conduct was consistent with that of an individual who suffers from antisocial personality disorder. The doctor noted that a person with an antisocial personality "has a longstanding history of being able to lie and to lie successfully." In discussing his assessment of defendant's recollection of the instant offense, and defendant's remorse regarding Lacomchek's death, Dr. Welner stated:

> I felt that [defendant] sounded sincere all the time. I felt that if I was sitting there and if I would close my eyes and listen to him, or even just open my eyes and listen to him, that I would have found him utterly believable. If I would have sat with [defendant] and he would have been my entire source of information he would leave me with the impression that everything happened exactly as it did.

Defense counsel did not object to Dr. Welner's testimony concerning defendant's personality disorder or the evidence that Dr. Welner relied on to form the basis of his diagnosis. However, the trial court cautioned the jury not "to infer that on the night in question that the defendant acted in conformance with those prior acts mentioned, that he's a bad person, or that because of those prior acts he committed the offense here charged." It then instructed the jury that Dr. Welner's discussion of defendant's alleged prior bad acts must be considered only for the "limited and sole purpose" of assessing "the foundation of certain conclusions drawn by [Dr. Welner] with respect to [his] psychiatric diagnosis."

The jury found defendant guilty of purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1),(2). The trial court sentenced defendant to a life term, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, or sixty-two years, six months, and nineteen days, to be served without parole.

The Appellate Division reversed defendant's conviction and remanded for a new trial. It held that Dr. Welner's testimony regarding defendant's personality disorder, which included inadmissible hearsay statements, "as well as opinions regarding the credibility and moral character of defendant," unduly prejudiced defendant, and thus had the capacity to produce an unjust result. *Vandeweaghe, supra*, 351 *N.J.Super.* at 476, 799 *A.*2d 1. The panel also noted that the trial court erred in allowing Officer McGee to testify that he was dispatched approximately one-half hour before defendant's arrest to investigate a report that "a male was beating a female," because such testimony constituted inadmissible hearsay evidence. *Id.* at 484–85, 799 *A.*2d 1.

We granted the State's petition for certification, 174 *N.J.* 363, 807 *A.*2d 194 (2002), and now affirm.

## II

### A

■ The State concedes that evidence of defendant's personality disorder was irrelevant to whether he possessed the *mens rea* required for purposeful or knowing murder. The State argues, however, that Dr. Glass's testimony that a personality disorder cannot be diagnosed when an individual is under the influence of alcohol "opened the door" to allow Dr. Welner to explain the basis of his diagnosis of antisocial personality disorder.

■ In *State v. James,* we stated that the " 'opening the door doctrine' is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) *admissible evidence* that generates an issue, or (2) *inadmissible evidence* admitted by the court over objection." 144 *N.J.* 538, 554, 677 *A.*2d 734 (1996); *see also State v. Farthing,* 331 *N.J.Super.* 58, 81, 751 *A.*2d 123 (App.Div.), *certif. denied,* 165 *N.J.* 530, 760 *A.*2d 784 (2000). The doctrine "allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of

related evidence." *James, supra,* 144 *N.J.* at 554, 677 *A.*2d 734. We also discussed the related doctrine of "curative admissibility." *Id.* at 555, 677 *A.*2d 734. That doctrine provides that "when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice," the opposing party thereafter "may introduce otherwise inadmissible evidence to rebut or explain the prior evidence." *Ibid.* (citations omitted).

■ This Court has emphasized that the opening the door and curative admissibility doctrines can be used only "to prevent prejudice," and may not "be subverted into a rule for [the] injection of prejudice." *Id.* at 556, 677 *A.*2d 734 (quoting *United States v. Winston,* 447 *F.*2d 1236, 1240 (D.C.Cir.1971)). "Introduction of otherwise inadmissible evidence under the shield of [those] doctrine[s] is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" *Winston, supra,* 447 *F.*2d at 1240 (citation omitted). Here, the record is devoid of any evidence that the introduction of Dr. Glass's testimony that defendant's alcoholism precluded diagnosis of a personality disorder caused harm or prejudice to the State. Both Drs. Glass and Welner agreed at trial that a diagnosis of antisocial personality disorder is irrelevant to defendant's capacity to act purposely or knowingly. Accordingly, Dr. Welner should not have offered testimony in respect of his opinion that defendant suffered from antisocial personality disorder.

## B

■ Not only was the door closed, we also agree with the Appellate Division that much of Dr. Welner's testimony should have been excluded on grounds of undue prejudice and inadmissible hearsay. *Vandeweaghe, supra,* 351 *N.J.Super.* at 480–84, 799 *A.*2d 1. We adopt the panel's well-reasoned disposition of those issues below and add the following.

We particularly are concerned with Dr. Welner's testimony that defendant's personality disorder enabled him to "lie and to lie successfully." In *State v. J.Q.*, Judge (now Justice) Long discussed the propriety of expert testimony in respect of "the truthfulness of a statement by another witness," explaining:

> The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness. The phenomenon of lying, and situations in which prevarications might be expected to occur, have traditionally been regarded as within the ordinary facility of jurors to assess. For this reason, the question of a witness' credibility has routinely been regarded as a decision reserved exclusively for the jury.
>
> [252 *N.J.Super.* 11, 39, 599 *A.*2d 172 (App.Div.1991) (quoting *Commonwealth v. Seese*, 512 *Pa.* 439, 517 *A.*2d 920, 922 (1986)), *aff'd*, 130 *N.J.* 554, 617 *A.*2d 1196 (1993).]

Here, Dr. Welner "told the jury, in effect, that defendant was a liar" and that defendant had a "longstanding history of lying." *Vandeweaghe, supra,* 351 *N.J.Super.* at 480, 799 *A.*2d 1. Dr. Welner improperly suggested to the jury that it should not believe defendant. Such testimony impermissibly usurped the jury's exclusive role in assessing witness' credibility. *State v. Frisby,* 174 *N.J.* 583, 595, 811 *A.*2d 414 (2002) (" '[C]redibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance.' ") (quoting *J.Q., supra,* 252 *N.J.Super.* at 39, 599 *A.*2d 172); *State v. Pasterick,* 285 *N.J.Super.* 607, 620, 667 *A.*2d 1103 (App.Div.1995) ("There is no provision in our legal system for a 'truth-teller' who is authorized to advise the jury on the basis of *ex parte* investigations what the facts are and that the defendant's story is a lie."). Accordingly, the trial court should not have allowed Dr. Welner's testimony in respect of defendant's veracity.

## C

■ Because defense counsel failed to object to Dr. Welner's testimony regarding defendant's antisocial personality disorder, the basis for Dr. Welner's diagnosis of that disorder, and defen-

dant's resultant capacity for truth-telling, we must now decide whether the introduction of that testimony was plain error, warranting a new trial. *R.* 2:10–2. *See State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971) (stating that new trial is required when error is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached").

We agree with the panel below that Dr. Welner's diagnosis of defendant as having a personality disorder, his description of that disorder, and the recitation of hearsay that formed the basis of his opinion were "extremely prejudicial to defendant." *Vandeweaghe, supra,* 351 *N.J.Super.* at 483, 799 *A.*2d 1. Following Dr. Glass's statement that defendant could not be diagnosed with a personality disorder because of his alcoholism, the prosecutor should have objected on the ground that the proffered psychiatric evidence was irrelevant to whether defendant possessed the requisite *mens rea* at the time of the offense to be found guilty of the crime of murder, *N.J.S.A.* 2C:11–3a(1),(2). Instead, the State impermissibly used Dr. Welner's testimony as a conduit for the " 'wholesale [introduction] of otherwise inadmissible evidence.' " *Farthing, supra,* 331 *N.J.Super.* at 79, 751 *A.*2d 123 (citation omitted). Defense counsel's failure to object does not excuse the State's introduction of such highly prejudicial evidence. Accordingly, we conclude that Dr. Welner's testimony was so prejudicial as to clearly produce an unjust result and deny defendant the right to a fair trial.

## III

 Finally, we address the finding of the Appellate Division panel below that the trial court erred in allowing Officer McGee to testify that he was dispatched to the Flamingo Motel approximately one-half hour before defendant's arrest to investigate a report that "a male was beating a female." *Vandeweaghe, supra,* 351 *N.J.Super.* at 484–85, 799 *A.*2d 1. The panel correctly noted that "a police officer may, without violating either the hearsay rule or

defendant's right to confrontation, explain the reasons he apprehended a suspect or went to the scene of the crime by stating that he did so 'upon information received.'" *Id.* at 484, 799 *A.*2d 1 (quoting *State v. Bankston,* 63 *N.J.* 263, 268, 307 *A.*2d 65 (1973)). Such testimony is admissible "to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct." *Bankston, supra,* 63 *N.J.* at 268, 307 *A.*2d 65. However, "when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused," that testimony violates both the hearsay rule and the accused's Sixth Amendment right of confrontation. *Bankston, supra,* 63 *N.J.* at 268–69, 307 *A.*2d 65; *see also Frisby, supra,* 174 *N.J.* at 592, 811 *A.*2d 414; *State v. Irving,* 114 *N.J.* 427, 446–47, 555 *A.*2d 575 (1989); *Farthing, supra,* 331 *N.J.Super.* at 75, 751 *A.*2d 123. Accordingly, on remand, although the State may "elicit evidence that the police went to the Flamingo based upon information received, it may not introduce evidence that the reason for the dispatch was a report of a man beating a woman." *Vandeweaghe, supra,* 351 *N.J.Super.* at 485, 799 *A.*2d 1.

## IV

The judgment of the Appellate Division is affirmed and the matter is remanded for further proceedings consistent with our decision.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.