NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0604-18T2

GURBIR S. GREWAL,
Attorney General of New Jersey,
and RACHEL WAINER APTER,
Director, New Jersey Division on
Civil Rights,[1]

      Plaintiffs-Appellants,

v.

WILLIAM AND OTHILIA GREDA
and MAPLE GARDEN, LLC,

      Defendants-Respondents.

_____

> APPROVED FOR PUBLICATION
>
> **May 13, 2020**
>
> APPELLATE DIVISION

> Argued February 24, 2020 – Decided May 13, 2020
>
> Before Judges Ostrer, Vernoia and Susswein.
>
> On appeal from the Superior Court of New Jersey,
> Law Division, Union County, Docket No. L-3414-16.
>
> James R. Michael, Deputy Attorney General, argued
> the cause for appellants (Gurbir S. Grewal, Attorney
> General, attorney; Jason W. Rockwell, Assistant

---

[1] The former Attorney General and Director of the New Jersey Division on Civil Rights brought this matter in their official capacities.  In accordance with Rule 4:34-4, we have amended the caption to identify the current Attorney General and Director as the proper plaintiffs.

Attorney General, of counsel; Megan J. Harris, Deputy Attorney General, on the briefs).

Vincent J. Sanzone, Jr., argued the cause for respondents.

The opinion of the court was delivered by

VERNOIA, J.A.D.

Plaintiffs, the New Jersey Attorney General and the Director of the New Jersey Division on Civil Rights (Division), appeal from a no-cause jury verdict on their claim defendant William Greda (defendant) violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, by inquiring about the religion of Fatma Farghaly, a Muslim woman, during her attempt to lease an apartment from him; by refusing to show or lease an apartment to her on the basis of her religion; and by making a statement concerning the gender of a Division investigator during the investigator's inquiry about leasing an apartment from him.[2] Plaintiffs argue the trial court erred by: allowing defendant's counsel to cross-examine Farghaly about her religious beliefs; refusing to allow introduction of defendant's statements to a news program concerning Farghaly, her discrimination claim, and Muslims; barring

---

[2] Defendant's wife, Othelia Greda, and Maple Shade, LLC, were also named defendants. Because the claims against Othelia Greda were later dismissed, and the claim against Maple Shade, LLC was rendered moot by the no-cause verdict as to defendant, we refer to William Greda as "defendant" for clarity and ease of reference.

testimony of Division investigators about their perceptions of defendant during their interactions with him; allowing cross-examination of Farghaly about her income tax returns; and asking prospective jurors if they believed Muslim women experience discrimination in the United States. Based on our review of the record, we are convinced the trial court made errors depriving plaintiffs of a fair trial, and we reverse.

I.

The Complaint

Plaintiffs' complaint alleged simple facts that we summarize to place in context our discussion of the trial evidence and issues raised on appeal. The complaint alleged that in February 2016, defendant and his wife, Othilia Greda, owned a seventeen-unit apartment building in Elizabeth.[3] Farghaly and a male friend, Deyab Elashkar,[4] met with defendant at the building because Farghaly sought to lease an apartment defendant advertised was available.

---

[3] The complaint also alleged that following the Division's service of an administrative, verified complaint alleging defendant unlawfully discriminated against Farghaly, defendant and his wife transferred ownership of the building for one dollar to Maple Garden, LLC, a limited liability company for which defendant is the registered agent.

[4] The complaint identified Elashkar as Farghaly's friend. We refer to him by his name for clarity and ease of reference.

A-0604-18T2

In accordance with "her religious practice," Farghaly wore a khimar, which is "a head covering or head scarf worn by some Muslim women."[5] The complaint alleged that after escorting Farghaly and Elashkar into the building, defendant asked Farghaly, "[a]re you Muslim[,]" and, when she responded affirmatively, defendant "stated, 'I don't rent to Muslims,' and asked [Farghaly] and [Elashkar] to leave." Farghaly and Elashkar left the building without seeing the apartment. Farghaly reported what occurred to the Elizabeth police, and, the next day, she reported it to the Division.

The complaint also alleged the Division began an investigation, and, two weeks later, Division investigators Adriana Tobar and Justin Hoffer met with defendant, with Tobar posing as a prospective tenant for an apartment defendant advertised was available.[6] Tobar wore a head scarf, and the

---

[5] The head-coverings worn by Farghaly and Tobar are variously referred to in the record as a khimar, hijab, or headscarf. We recognize there are different headscarves traditionally worn by Muslim women, see, e.g., What's the difference between a hijab, niqab and burka? http://www.bbc.co.uk.newsround/24118241 (last visited April 15, 2020). Where the record reflects a head-covering was identified by a particular term, we use the same term. Where no specific term was used, we employ the generic term "headscarf."

[6] The complaint did not include the names of the four Division investigators who interacted with defendant during the Division's investigation, but it instead referred to them as "Testers" "one" through "four." In our discussion of the allegations in the complaint, we use the names of the Testers for clarity and ease of reference. We note that in their brief on appeal, plaintiffs refer to

Division deemed Tobar and Hoffer "suitable to appear as individuals who, like [Farghaly], are of Middle Eastern descent and Muslim." The complaint alleged defendant showed Tobar and Hoffer a basement apartment but said the apartment was "not good for" Tobar because "she is a woman and would need to lift things up on bricks in case of flooding."

The complaint further alleged that, later the same day, two other Division female employees, Shante Lee and Ada Rollins, posed as prospective tenants and met with defendant. Neither of the investigators wore a head scarf or otherwise presented themselves as Muslim. The complaint alleged defendant showed them the basement apartment, but he did not mention flooding or the apartment's suitability for a woman.

The complaint also asserted that during the Division's investigation, defendant and his wife made unsupported claims Farghaly, who is unmarried and has no children, asked defendant if her husband or male companion, her mother-in-law, and two children could live in the apartment with her. Defendant told the Division that when he told Farghaly five people could not live in the apartment, Elashkar punched and threatened to kill him. Defendant

(continued)

investigator Adriana Tobar as "Adriana Tovar." We use the former name to identify the investigator because it is the name of the investigator, who testified at trial, reflected in the trial transcript.

also claimed there were past and present Muslim tenants in the building, but he did not provide the Division with any contact information for those tenants.

Plaintiffs' complaint averred that defendants: refused to rent Farghaly an apartment because of her creed in violation of N.J.S.A. 10:5-12(g)(1); made an inquiry regarding Farghaly's creed in connection with the rental of real property in violation of N.J.S.A. 10:5-12(g)(3); made statements to Farghaly expressing discrimination based on her creed in violation of N.J.S.A. 10:5-12(g)(3); made statements to Tobar expressing discrimination based on gender in violation of N.J.S.A. 10:5-12(g)(3); and transferred ownership of the apartment building with intent to hinder, delay, or defraud plaintiffs in violation of N.J.S.A. 25:2-25(a). In response to the complaint, defendants denied liability and filed counterclaims for abuse of process and malicious use of process. Defendants also filed third-party claims against Farghaly and Elashkar for slander, defamation, assault and battery, and intentional infliction of emotional distress.

The court dismissed the counterclaims prior to trial, severed the third-party claims, and stayed the third-party claims pending disposition of plaintiffs' claims. After presentation of all the evidence, the court dismissed the claims against Othilia Greda because there was no evidence she owned the building or participated in the rental of the apartments at issue.

6

<u>The Trial</u>

The five-day trial centered on the conflicting versions of what occurred when Farghaly and Elashkar met with defendant to discuss the possible rental of the basement apartment, and when defendant later met with the Division investigators posing as prospective tenants of apartments he advertised for lease.  It was, however, undisputed defendant posted an advertisement for a one-bedroom apartment in the building, and Farghaly called defendant and made an appointment to look at the apartment.

Farghaly testified she was living in another apartment in Elizabeth, was having financial difficulties, and sought a new apartment because her landlord intended to raise her rent and she had physical difficulties going up and down the stairs in her apartment.  According to Farghaly, she went to see defendant's apartment wearing a hijab, a head covering, in accordance with her custom as a Muslim woman.  She had never married or had any children, and she went to the apartment with Elashkar, who was her supervisor at work and a friend.

When she and Elashkar arrived at the building, defendant opened the door and let them into the building.  Farghaly testified that as defendant led them up the stairs to the apartment, he asked if she was a Muslim.  When Farghaly said she was, defendant replied, "I don't rent [to] Muslims."

A-0604-18T2

Farghaly explained she was shocked by defendant's statement, and she used her cellphone to record a video because she wanted a recording showing defendant turning her down because she was a Muslim. During the video, which was played for the jury, Farghaly repeatedly asks defendant, "you don't want to rent to me because I'm a Muslim?" The recording shows defendant looking past the camera, presumably at Elashkar, saying, "go ahead, hit me."

Farghaly and Elashkar denied any verbal dispute or physical altercation with defendant. Elashkar denied striking defendant or spitting at him. Elashkar initially denied saying anything after hearing defendant's statement he did not rent to Muslims, but on cross-examination he testified, in accordance with a written statement he gave days after the incident, he said "seriously?" after defendant's statement and also said he would call the police. Elashkar testified he called 9-1-1 and briefly spoke to a dispatcher.

The video recording shows defendant repeatedly asking Farghaly and Elashkar to leave the building. Once defendant, Farghaly, and Elashkar were outside of the building, Farghaly states what she alleged occurred in the building and tells defendant she intends to post the recording on Facebook.

Farghaly immediately went to the Elizabeth Police Department and reported the incident. The next day, she filed an administrative complaint with the Division, which then commenced its investigation.

Division investigator Tobar testified that two weeks later she made an appointment with defendant to look at an apartment he advertised was available in the building. When she arrived at the building with Hoffer, Tobar wore a head scarf and introduced herself as "Samia Hassan." Defendant did not introduce himself, and Hoffer testified defendant "just kind of stared at [Tobar]," "appeared . . . fixated on her," and told Hoffer the apartment was for one person. They told defendant that Hoffer would not rent the apartment with Tobar.

According to Tobar, defendant led them to a basement studio apartment that was dirty, in poor condition, and did not appear suitable for human habitation. After some discussion about the apartment, defendant said the apartment would not be good for Tobar or any woman because it flooded, and she would need to lift things and put them on bricks during a flood. Defendant explained the apartment last flooded during Superstorm Sandy. Tobar asked twice for a lease application, but defendant did not give it to her. Tobar told defendant she had other apartments to look at, and she and Hoffer left the building.

Division employee Lee testified that, later the same day, she made an appointment with defendant to look at an apartment. She went to the apartment with Rollins, and defendant showed them the basement apartment he

9                                                        A-0604-18T2

had shown Tobar. Lee wore pants and a blouse, and she did not wear a headscarf. Defendant answered Lee's questions about the apartment and repairs defendant was making to it. Lee told defendant she would call him later, and then she and Rollins left. Defendant never offered Lee a lease application, and Lee did not request one.

Defendant testified he was seventy years old, his first language was Polish, and he had recently undergone foot surgery when Farghaly visited the building. Defendant disputed Farghaly's and Elashkar's version of the events, and he denied he asked Farghaly about her religion. He also testified he had Muslim and female tenants in the building.

Defendant explained that when he first spoke with Farghaly on the phone, she said she intended to live alone in the apartment, but he heard screaming children in the background and was therefore "suspicious." He testified he only permitted one or two people to live in his apartments due to their size. He greeted Farghaly and Elashkar, thought Elashkar looked like a criminal, and walked slowly with them to the apartment.

Defendant testified he asked Farghaly about the children he heard in the background during their telephone call, and she said her mother or mother-in-law had been watching children. He asked Farghaly how many people she intended would reside in the apartment, and she said "there's five of us."

According to defendant, he said "no good," turned around and repeated "no good," and then told Farghaly, "it's a small apartment, it's too many - - it's overcrowding."

Defendant held the stairway railing with his hand. He testified that immediately after he told Farghaly the apartment was too small, Elashkar lightly struck his hand six to eight times. Defendant testified Farghaly screamed at him in Arabic; and Elashkar spit on him, said "you dead," and left the building. Defendant explained that, as he wiped the spit off of himself, Farghaly began recording him on her phone. He attempted to call the police but could not dial his phone because his hands were shaking. He asked Farghaly to leave the building.

Defendant testified he believed it possible Farghaly and Elashkar planned their encounter with him to fabricate a discrimination claim and extort money. He had read a story about a Muslim woman who made a false report in New York, claiming to have been attacked. He also believed it was possible Farghaly and Elashkar belonged to ISIS and planned to use the money they were attempting to extort from him to support ISIS or some religious organization.

Defendant responded to questions concerning his interactions with the Division investigators. He said that when he saw Tobar, whom he identified as

a Muslim, it was only weeks after the Farghaly incident. Defendant testified Hoffer carried a bulky attaché case, and he was afraid "two Muslims"—Hoffer and Tobar—"were coming to finish [him] off." He testified he nonetheless got Tobar a lease application, but she did not take it after he explained the apartment flooded. Defendant had no recollection of meeting Lee and Rollins.

Defendant presented Ahmed Eleoridi as a witness. Eleoridi testified he is a Muslim and has resided in defendant's building since 2012; defendant has treated him fairly and well; and defendant was nice to his family, including women wearing hijabs, when they visited in 2017. Defendant testified he was not aware Eleoridi was Muslim until his family visited in 2017, when he saw female relatives wearing clothing indicative of their faith. Eleoridi also testified that three months prior to trial, defendant leased an apartment to a Muslim tenant he recommended.

The jury returned a no-cause verdict on plaintiffs' claims. It found plaintiffs failed to prove defendant asked Farghaly about her religion, defendant expressed discrimination against Farghaly based on her religion, and defendant refused to rent the apartment to Farghaly based on her religion. The jury also found plaintiffs failed to prove defendant expressed discrimination by referring to Tobar's gender in connection with the rental of an apartment.

The court entered an order dismissing the complaint with prejudice. Prior to trial, defense counsel advised the court defendants would not pursue their third-party claims if there was a defense verdict. Thus, with the court's entry of the order dismissing the complaint with prejudice, the court also dismissed defendant's third-party claims. This appeal followed.

## II.

### A.

Plaintiffs claim the court erred by permitting defense counsel to cross-examine Farghaly about her religious beliefs, the tenets of her religion, and the use of religious extremist rhetoric. They claim the cross-examination violated applicable Rules of Evidence and was unduly prejudicial because it was improperly employed to challenge Farghaly's credibility and attack her character. We agree.

"A trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" Belmont Condo. Ass'n v. Geibel, 432 N.J. Super. 52, 95 (App. Div. 2013) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). "On appellate review, a trial court's evidentiary ruling must be upheld 'unless it can be shown that the trial court palpably abused its discretion, that is, that its

finding was so wide [of] the mark that a manifest denial of justice resulted.'" Id. at 95-96 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Plaintiffs' challenge to the cross-examination of Farghaly is founded on the following questions and testimony. During her direction examination, Farghaly was asked if she had ever considered "letting . . . go" of her claims against defendant. She responded, stating she had considered doing so because her "religion . . . taught [her] how to forgive and forget and [her] parents always teach [her] the same thing." She also explained she decided to pursue her claims because she did not want others "to go through what [she] went through."

On cross-examination, Farghaly was questioned as follows:

DEFENSE COUNSEL: Now you told us yesterday that you['re] a devout Muslim, you believe in the teachings of your faith, correct?

FARGHALY: Correct.

DEFENSE COUNSEL: And you follow the teachings of the Quran, correct?

FARGHALY: Correct.

DEFENSE COUNSEL: Have you ever heard of the principle –

Plaintiffs' counsel objected, and the trial judge held a side-bar conference. Defense counsel explained he intended to ask Farghaly about a

section of the Quran that provides "she could lie as a Muslim," and he argued Farghaly had opened the door to the questions by previously testifying that forgiveness was a tenet of the Muslim faith. Plaintiffs' counsel argued defense counsel's questions should be limited to portions of the Quran related to forgiveness, but the court said, "no, I can't do that."

The court accepted defense counsel's argument Farghaly opened the door to the questions concerning the Quran, and overruled plaintiffs' objection. In addition, although the word "infidel" had never been mentioned by Farghaly during her direct testimony, defense counsel told the court he intended to ask Farghaly whether she had heard the word "infidel," because in the past she denied knowing what it meant.[7] The court ruled in defendant's favor, stating, "you can ask her that."

Based upon the court's rulings, defense counsel questioned Farghaly as follows:

> DEFENSE COUNSEL: As a practicing Muslim, I'm sure you've read the Quran?
>
> FARGHALY: Of course.
>
> DEFENSE COUNSEL: Okay. Now have you heard of the principle in the Quran which establishes by Mohammed that there are circumstances that can

---

[7] During her deposition, Farghaly denied knowing the word "infidel."

compel a Muslim to tell a lie?  And that's in Quran 16:106, have you ever heard that principle?

FARGHALY:  Yes.

DEFENSE COUNSEL:  You did?

FARGHALY:  Yes.

DEFENSE COUNSEL:  That a Muslim could lie?

FARGHALY:  Yes.

DEFENSE COUNSEL:  And in fact, that's called the principle and I'm going to have to spell it, T-A-Q-U-Y-Y-A, correct?

FARGHALY:  Correct.

DEFENSE COUNSEL:  In fact, every Muslim sect agrees with that principle, cause it's in the Quran?
FARGHALY:  Yes.

DEFENSE COUNSEL:  Now have you ever heard Muslims calling non-Muslims, Christians, Jews, Buddhists, Hindu, infidels?

FARGHALY:  Infidels?

DEFENSE COUNSEL:  Infidels?

FARGHALY:   Infidels?

DEFENSE COUNSEL:  Yes.

FARGHALY:  I don't know that word.

DEFENSE COUNSEL:  You never heard the word infidels?

FARGHALY:  Not in English, no I never.

DEFENSE COUNSEL:  Okay, what does infidel mean in, how do you say it in Arabic?

FARGHALY:  I don't even know what it means in English.

DEFENSE COUNSEL:  You never heard that word?

FARGHALY:  No.  I practice the Quran in Arabic, not in English.

DEFENSE COUNSEL:  Okay.  Okay.  So you never heard, um, one Muslim, or any Muslim calling a non-Muslim an infidel?  You never heard that in social media?

FARGHALY:  Okay, I think I get the meaning of it, since you already mentioned that.  For us Muslims, we have to believe in all religions and respect all religions.  We can't call anybody anything.

DEFENSE COUNSEL:  But you've heard many Muslims call non-Muslims infidels, isn't that correct?

PLAINTIFFS' COUNSEL:  Objection.  Asked and answered.

FARGHALY:  If they want to, we're not supposed to.

THE COURT:  Overruled.

DEFENSE COUNSEL:  You've heard that, you've heard that, right?

FARGHALY:  Okay.

DEFENSE COUNSEL:  Have you?

17

FARGHALY:  I haven't heard it personally, but they're not supposed to.

DEFENSE COUNSEL:  You never heard any Muslim referring to a non-Muslim as an infidel?

FARGHALY:  If they want to do that, but that's not welcome in our religion.  We have to respect and honor every religion.  Like our prophet Mohammed says.

DEFENSE COUNSEL:  What do you call people who are non-Muslims?  What do you call them?

FARGHALY:  Christians, Catholic, Atheists, Buddhism, Hinduism.

DEFENSE COUNSEL:  Would you agree that infidel is a derogatory term for non-Muslims.

FARGHALY:  No, you call them by what they are.

DEFENSE COUNSEL:  Okay, would you, would you agree that that word infidel which you've never heard before.

FARGHALY:  Um hum.

DEFENSE COUNSEL:  But now you know about.

FARGHALY:  Since you described it a little bit, explained it yes.

DEFENSE COUNSEL:  Um hum, yeah, um hum. When I deposed you back in July 18, 2018, you told me under oath that you never heard, you never heard the word infidel?

FARGHALY:  Like I just said now.  I never did.

A-0604-18T2

DEFENSE COUNSEL: Would you agree that that term is a derogatory term.

FARGHALY: No, it's not the right term.

DEFENSE COUNSEL: Is it a derogatory term?

FARGHALY: I don't know what's a dog . . . ,

DEFENSE COUNSEL: Derogatory term means for lack of a better word, a, a reference, a disgraceful description of somebody?

FARGHALY: How can we disgrace if our religion orders us to believe in all religions and respect all religions?

Thereafter, on redirect, plaintiffs' counsel asked Farghaly to explain what the Quran stated about lying, and she testified the Quran permits Muslims to lie about their religion in cases where it is necessary to do so in order to remain safe.

On re-cross, defense counsel asked these additional questions:

DEFENSE COUNSEL: Isn't it true that the, that the Muslim practice of deception only, also implies, also applies and is prevalent in Islamic politics? Is it al . . ., doesn't, not only does it apply to war, but it also applies to politics and other types of deceptions when you're dealing with people of non-Muslim faith?

FARGHALY: That's not true.

DEFENSE COUNSEL: Are you familiar with the Quran?

FARGHALY: Of course.

> DEFENSE COUNSEL: 16:106 in the Teachings of Deception. Have you ever read that paragraph?
>
> FARGHALY: In Arabic, not in English.
>
> DEFENSE COUNSEL: You've read it?
>
> FARGHALY: In Arabic, not in English.

The cross-examination about Islam did not end there. While questioning Farghaly about her income tax returns, defense counsel asked her to confirm the spelling of her accountant's name, "F-A-R-E-S . . . K-A-D-A-N," and then asked, "he's Muslim too, right?" When he cross-examined Farghaly about treatment by her physician, defense counsel said, "and, just for the record, can you please pronounce his last name because I have difficulty with that name . . . ." Farghaly responded her physician's name was "Elsharif," and defense counsel asked, "Elsharif? He's Muslim, too, as well?" Farghaly responded in the affirmative.

The cross-examination of Farghaly about the principles of her religion violated N.J.R.E. 610, which plainly and expressly provides "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness's credibility is impaired or enhanced." See, e.g., United States v. Kalaydjian, 784 F.2d 53, 56-57 (2d Cir. 1986) (affirming the court's denial of a request to cross-examine

a witness about his religious beliefs for refusing to swear on the Quran because Federal Rule of Evidence 610 prohibits questioning a witness about his or her religious beliefs); United States v. Acosta, 924 F.3d 288, 293 (6th Cir. 2019) (finding a prosecutor engaged in misconduct by questioning a witness about religious prayers and the Ten Commandments); United States v. Jorell, 73 M.J. 878, 882-84 (A.F. Ct. Crim. App. 2014) (holding the trial court correctly barred cross-examination about a witness's Wiccan religious beliefs to impugn the witness's credibility). Farghaly also enjoyed a privilege from disclosing her "religious belief[s] unless [her] adherence or nonadherence to such . . . [beliefs] [was] material to an issue in the action other than that of [her] credibility as a witness." N.J.R.E. 512; N.J.S.A. 2A:84A-24.

Defense counsel's questioning about Farghaly's religious beliefs and the principles in the Quran constituted a clear and direct attack on her credibility. Indeed, the questioning sought information that had no substantive, probative value to any factual issue presented in the matter. Through the cross-examination, defense counsel sought to establish the Quran, the religious text central to Farghaly's faith, directed and condoned lying and telling falsehoods as one of its fundamental principles. The cross-examination further sought to establish Farghaly's faith included another tenet showing a bias affecting her

credibility as a witness—her religion required she view anyone who did not share her faith as an infidel.

The cross-examination was not intended to affect only Farghaly's credibility. Although Elashkar was not asked similar questions, he identified as Muslim, and defendant intended that Farghaly's testimony adversely affect Elashkar's credibility as well. Defendant acknowledges as much in his brief on appeal; he argues the questioning constituted "proper cross-examination questions" that "went to [Farghaly's] credibility," and was for the purpose of "test[ing]" Farghaly and Elashkar "and pu[ting] those two individuals in a bad light." The strategy was not limited to Farghaly and Elashkar -- during cross-examination defense counsel gratuitously suggested Farghaly's accountant is Muslim and confirmed her treating physician is Muslim.

In his brief on appeal, defendant does not dispute the applicability of N.J.R.E. 512 or 610, or that they barred the cross-examination of Farghaly about her religious beliefs as a means of attacking her credibility. He also does not contest the cross-examination about the use of the term infidel, which he concedes was for the purpose of putting Farghaly and Elashkar in a "bad light," violated N.J.R.E. 608. See, e.g., State v. Hernandez, 225 N.J. 451, 466-67 (2016) (explaining specific instances of conduct that are relevant only as tending to prove a character trait are inadmissible to affect a witness's

credibility).  Instead, defendant claims plaintiffs' counsel did not cite any Rules of Evidence when she objected to the testimony, and the testimony was otherwise admissible because Farghaly's direct testimony, that her religion taught her forgiveness, opened the door to cross-examination about her religious beliefs.  We are not persuaded.

"[T]he '"opening the door doctrine" is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.'"  State v. Vandeweaghe, 177 N.J. 229, 237 (2003) (quoting State v. James, 144 N.J. 538, 554 (1996)).  "The doctrine 'allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.'"  Id. at 237-38 (quoting James, 144 N.J. at 554).

The opening the door doctrine "has its limitations."  State v. B.M., 397 N.J. Super. 367, 381 (App. Div. 2008) (quoting James, 144 N.J. at 554).  Evidence admitted under the doctrine "can be used only 'to prevent prejudice,' and may not 'be subverted into a rule for [the] injection of prejudice.'"  Vandeweaghe, 177 N.J. at 238 (quoting James, 144 N.J. at 556).  Evidence that is otherwise inadmissible may be admitted under the doctrine, but "only to the

extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." Ibid. (quoting United States v. Winston, 447 F.2d 1236, 1240 (D.C. Cir. 1971)). Moreover, such evidence is also subject to exclusion under N.J.R.E. 403 where its probative value "is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury." B.M., 397 N.J. Super. at 381 (quoting James, 144 N.J. at 554).

Farghaly's direct testimony about her religion teaching forgiveness did not open the door to the challenged cross-examination questions about use of the term infidel and the purported principles in the Quran about lying. Farghaly's scant direct testimony about forgiveness may have properly opened the door to limited questioning about the nature and source of her religious beliefs about forgiveness, but, as noted, defense counsel's cross-examination was unrelated to any issues raised by Farghaly's direct testimony and was unnecessary to remove any purported prejudice resulting from that testimony. Vandeweaghe, 177 N.J. at 238.

We are also convinced the cross-examination questions elicited testimony inadmissible under N.J.R.E. 403. The evidence had no probative value and was highly prejudicial because it improperly permitted the jury to weigh Farghaly's testimony about the tenets of Islam and the putative practices

24

of Muslims in assessing the credibility of each of the witnesses. Thus, even if Farghaly had opened the door to such testimony, and she did not, it should have been barred under N.J.R.E. 403.

We are not persuaded by defendant's claim plaintiffs' failure to identify the Rule of Evidence supporting the objection to cross-examination requires rejection of plaintiffs' argument on appeal. To be sure, plaintiffs' counsel might have been more specific and consistent in objecting to the testimony, but even if no objection had been made, the challenged cross-examination questions and testimony require a reversal because they were clearly capable of producing an unjust result. R. 2:10-2.

The claims founded on the incident involving Farghaly's attempt to lease the apartment are wholly dependent on the credibility of Farghaly, Elashkar, and defendant. They were the only individuals present. The improper cross-examination of Farghaly in violation of N.J.R.E. 403, 512, 608, and 610, and defense counsel's acknowledged effort to portray Farghaly and Elashkar in a "bad light" based on their religious beliefs and the putative use of the word infidels by Muslims, were clearly capable of allowing the jury to conclude, on an improper basis, that Farghaly and Elashkar were not credible witnesses. The questioning about the use of the term infidels also allowed those members of the jury who were not Muslim to inaccurately and improperly perceive that

Farghaly and Elashkar viewed them as infidels. In a case in which the credibility of Farghaly and Elashkar was central to the jury's determination, the introduction of highly prejudicial evidence directed at their credibility and character was clearly capable of producing an unjust result. For those reasons alone, we reverse the final order dismissing plaintiffs' complaint, and we remand for a new trial.

B.

Plaintiffs also contend the court erred by barring admission of a recording of statements made by defendant concerning the Farghaly incident and Muslims during an interview with a news organization, and by barring cross-examination of defendant concerning the statements. Plaintiffs contend defendant's statements are probative of his bias towards Muslims and are relevant to his credibility because they contradict his trial testimony. The recording does not include the entire interview between defendant and the news reporter. Plaintiffs subpoenaed the unaired portions of the interview with defendant, and the news organization advised that the unaired recorded portion of the interview had not been preserved.

The court granted an in limine motion to bar introduction of defendant's recorded statements under N.J.R.E. 403, finding the recording did not include the entirety of defendant's interview by the reporter, the recording could have

26

been unfairly edited, and therefore it would be unduly prejudicial. The court also barred any questioning about the interview and defendant's recorded statements, but it permitted questioning about defendant's current beliefs concerning Muslims.

The parties do not dispute evidence of defendant's alleged bias against Muslims is relevant under N.J.R.E. 401 because plaintiffs allege defendant's statements to Farghaly and Elashkar and his purported refusal to lease Farghaly an apartment were motivated by anti-Muslim animus in violation of the LAD. A party's derogatory statements concerning the specific characteristic—in this case, religion—at issue in a discrimination case are relevant to proving an LAD claim, see, e.g., Cutler v. Dorn, 196 N.J. 419, 432-40 (2008) (explaining anti-Semitic statements made in the workplace supported an LAD claim for religious discrimination in employment), and they are admissible as statements of a party opponent under N.J.R.E. 803(b)(1).

On appeal, the parties' arguments are directed to whether the recorded statements should have been admitted under N.J.R.E. 106, which in pertinent part provides "[w]hen a . . . recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously." Defendant claims the court properly barred

the playing of his recorded statements under the doctrine of completeness embodied in N.J.R.E. 106 because plaintiffs did not produce a recording of his entire interview. See State v. Gomez, 246 N.J. Super. 209, 217 (App. Div. 1991) (explaining the object of the "doctrine of completeness" "is to permit the trier of the facts to have laid before it all that was said at the same time upon the same subject matter").

Where, as here, there was an inadvertent deletion of a portion of a statement and there was no additional recording with which to provide the complete statement, neither N.J.R.E. 106 nor the doctrine of completeness mandates an order barring admission of recorded statements that are available. In State v. Nantambu, our Supreme Court discussed the standard for admitting recordings of a portion of a party's statements where the balance of the party's statements were not recorded or are not available:

> Applying the established standards governing the admissibility of recordings, we find no basis to conclude that exclusion of a recording in its entirety is required merely because an omission rendered a portion of the recording unduly prejudicial. Rather, we hold that a trial court should conduct a hearing pursuant to N.J.R.E. 104 to determine, in [its] discretion, whether an omission or similar flaw in the recording renders all or part of that recording unreliable and therefore inadmissible as unduly prejudicial under N.J.R.E. 403. The trial court should admit the recording to the extent that it contains competent and relevant evidence and redact the portion of the recording deemed unduly prejudicial.

[221 N.J. 390, 406 (2015).]

The trial court did not undertake the analysis required to determine the admissibility of the recording of defendant's statements. Instead, the court declared it did not have confidence the editing of defendant's statements on the recording was done fairly because "news broadcasters are not necessarily Walter Cronkites anymore." It was on that erroneous basis the court concluded the recording was unduly prejudicial and inadmissible.[8]

We vacate the court's order barring admission of the recording of defendant's statements and cross-examination of defendant concerning the statements. While we generally defer to a trial court's evidentiary rulings, we owe no such deference where, as here, they are premised on a misapplication of the appropriate legal standard. Id. at 403; see also Villanueva v. Zimmer, 431 N.J. Super. 301, 310-11 (App. Div. 2013). On remand, the trial court shall conduct the N.J.R.E. 104 hearing required in Nantambu, see id. at 406,

---

[8] We observe defendant was questioned during his deposition about the recorded statements. He acknowledged he made the statements and did not dispute they were accurately represented on the recording.

and consider the admissibility of defendant's recorded statements under the following two-part analysis prescribed by the Court:[9]

> The court must first determine if the omission is unduly prejudicial; that is, does the omission adversely impact the trustworthiness of the recording. That is an objective analysis that should focus on the evidentiary purposes for which the recording is being offered. If the trial court in its discretion finds the omission unduly prejudicial, it must then consider whether the omission renders all or only some of the recording untrustworthy, and suppress only the portion of the recording that is rendered untrustworthy.
>
> [Id. at 410-11.][10]

---

[9] On remand, the court may also consider such other arguments the parties may make concerning the admissibility of the recorded statements and any questioning of defendant regarding them.

[10] It is unnecessary to determine if the court's order barring admission of the recorded statements and cross-examination about them constitutes reversible error because we reverse and remand for a new trial on other grounds. However, in the absence of those other grounds, we would vacate the court's order barring admission of the recorded statements and cross-examination, and remand for the court to conduct the hearing required by Nantambu and determine the admissibility of the statements and cross-examination under the appropriate standard. We would also otherwise find that if the court determined on remand the recordings and cross-examination were admissible, then the court's final order should be vacated and a new trial held. Because resolution of the fact issues depended on the parties' credibility, the exclusion of evidence concerning defendant's derogatory statements about Muslims, his characterization of Farghaly and Elashkar as terrorists, and his other anti-Muslim statements included on the recording, was clearly capable of producing an unjust result. R. 2:10-2. The recorded statements, if admissible, confirm defendant's anti-Muslim animus. They also undermine his credibility because they appear contradictory to his trial testimony. The recording includes defendant's statements Farghaly and Elashkar were Muslim extremists

C.

Plaintiffs also assert the trial court erred by barring testimony of Division employees Tobar and Hoffer offering descriptions of defendant's actions and their observations during their interactions with defendant at the building. More particularly, plaintiffs argue the court erred by sustaining defendant's objection to Tobar's anticipated testimony that when she first approached defendant, he "stared" at her. The court ruled Tobar could not make "subjective statements," explaining the court did not "want adverbs" or "adjectives," and just "want[ed] facts." Plaintiffs also assert the court erred by barring Hoffer's testimony that he found it "odd" the parking lot at the building was empty when he arrived, and by striking Hoffer's testimony that defendant's "tone and demeanor" were "unwelcoming" when Tobar and Hoffer interacted with defendant and his experience with defendant was "appalling."

N.J.R.E. 701 permits lay witnesses to offer "opinion[] or inference[]" testimony "if it (a) is rationally based on the witness's perception; and (b) will assist in understanding the witness's testimony or determining a fact in issue."

---

(continued)
who belonged to ISIS, and they were part of a broader Muslim conspiracy to extort money.

The Rule permits lay witnesses to provide opinion testimony based on their perceptions and actual knowledge, <u>Velazquez v. City of Camden</u>, 447 N.J. Super 224, 236-27 (App. Div. 2016), including opinions concerning the appearance and demeanor of others. <u>See, e.g.</u>, <u>State v. Smith</u>, 58 N.J. 202, 213 (1971) (permitting lay testimony that an individual was intoxicated); <u>Estate of Nicolas v. Ocean Plaza Condo. Ass'n</u>, 388 N.J. Super. 571, 582-83 (App. Div. 2006) (allowing lay testimony that a decedent was mentally unsound); <u>State v. Walker</u>, 216 N.J. Super. 39, 45 (App. Div. 1987) (allowing lay testimony that a person was tired, depressed, and in a state of shock).

The court's oft-repeated ruling witnesses would be limited to only the "facts," and its apparent prohibition against lay opinion testimony, was inconsistent with N.J.R.E. 701. Tobar's testimony defendant "stared" at her and Hoffer's testimony defendant was "unwelcoming" were based on their perceptions and would have assisted the jury in determining whether defendant violated the LAD. It was error for the court to exclude such admissible lay opinion testimony.

We are not, however, convinced the court erred by excluding Hoffer's testimony it was "odd" the parking lot was empty or that his experience with defendant was "appalling." Although this testimony may have been in part based on Hoffer's personal perceptions, we discern no basis in the record to

conclude the number of cars in the parking lot or Hoffer's personal opinion concerning his interaction with defendant would properly assist the jury in determining any facts at issue at trial. N.J.R.E. 701; see, e.g., Piech v. Layendecker, 456 N.J. Super. 367, 379 (App. Div. 2018) (finding a violation of N.J.R.E. 701 because "the witnesses' subjective belief" concerning the foreseeability of an accident "would not assist the jury in determining" the fact issues presented).

The court's error in barring Tobar's testimony and Hoffer's testimony defendant was "unwelcoming" does not require reversal of the jury's verdict because it was not clearly capable of producing an unjust result. R. 2:10-2. In any event, on remand the court shall permit appropriate lay opinion testimony in accordance with N.J.R.E. 701.

D.

Plaintiffs also assert they were deprived of a fair trial because during the voir dire of the prospective jurors the court asked the following question: "do you feel that Muslims or the Muslim religion in general are a discriminated minority in the United States, and if so, explain why you feel that?" Plaintiffs argue the court erred by requiring only those prospective jurors who answered the question in the affirmative to explain the reasons for their feelings, and by

33

failing to similarly require prospective jurors answering in the negative to explain theirs.

Plaintiffs' argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We note only that we discern no basis to conclude the court abused its discretion by asking the question in response to defendant's request. See Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 41-42 (2009) (explaining trial courts have discretion in conducting jury voir dire and determining the qualifications of prospective jurors). Moreover, plaintiffs did not object to the question or request the court require prospective jurors responding in the negative to explain their answer, and the record does not support a conclusion the court's purported error was a plain error clearly capable of producing an unjust result. R. 2:10-2; State v. Winder, 200 N.J. 231, 252 (2009). If, on remand, the court asks prospective jurors the same question, we do not preclude plaintiffs from requesting the court inquire of those answering in the negative to explain the basis for their feelings.

E.

We are also unpersuaded by plaintiffs' claim the court erred by allowing defendant access to Farghaly's tax returns, and by permitting defendant to cross-examine Farghaly about the returns. Plaintiffs argue the court incorrectly permitted defendant to use the tax returns to challenge Farghaly's

credibility on issues—the amount of her income and accuracy of the returns—that were extraneous to the causes of action and damage claims presented for the jury's determination. Thus, plaintiffs assert the questioning of Farghaly about the returns violated N.J.R.E. 403 and 608.

We recognize public policy disfavors disclosure of tax returns, see Ullmann v. Hartford Fire Ins. Co., 87 N.J. Super. 409, 415-16 (App. Div. 1965), but plaintiffs' argument ignores the record. Contrary to plaintiffs' contention, the amount of Farghaly's income was not an extraneous issue about which it was improper to inquire. Farghaly's income, and the credibility of her testimony concerning it, was placed in issue by plaintiffs during their counsel's direct examination of Farghaly. On direct examination, plaintiffs first asked Farghaly about her income, and Farghaly reported her income in response to plaintiffs' counsel's questions.

Although the purpose of plaintiffs' counsel's questions concerning Farghaly's income is unclear, and the record does not readily reveal the probative value of that testimony, we discern no abuse in the court's discretion in allowing cross-examination concerning Farghaly's tax returns that revealed inconsistencies in her testimony about her income. The cross-examination did not constitute a collateral attack on Farghaly's credibility founded on an extraneous issue. See, e.g., State v. Scott, 229 N.J. 469, 495 (2017) (Albin, J.,

35

concurring) (explaining "a defendant, on trial for aggravated assault, cannot be asked whether he misstated his income on his tax returns" as a means of challenging credibility); Serrano v. Underground Utils. Corp., 407 N.J. Super. 253, 275 (App. Div. 2009) (explaining extrinsic evidence concerning an extraneous matter is not relevant for purposes of challenging a witness's credibility). Instead, the cross-examination properly challenged Farghaly's credibility as well as her substantive testimony about her claimed income. See State v. Feaster, 184 N.J. 235, 248 (2005) (explaining "[o]ne of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination").

We are satisfied the court did not abuse its discretion in allowing cross-examination concerning the tax returns based on the testimony and evidence presented at the trial. We do not decide or offer an opinion whether information concerning Farghaly's income is relevant, admissible evidence at the re-trial, and we do not foreclose plaintiffs from arguing on remand that cross-examination concerning the tax returns should either be limited or barred based on the evidentiary record presented at that time.

Reversed and remanded for a new trial in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION