# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3716-24

M.A.,[1]

    Plaintiff-Appellant,

v.

J.H.M.,

    Defendant-Respondent.

_____

        Submitted May 5, 2026 – Decided May 27, 2026

        Before Judges Firko and Perez Friscia.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-0691-24.

        Kelly Berton Rocco, attorney for appellant.

        Ricci & Fava, LLC, attorneys for respondent (Michael J. DeMarco, of counsel and on the brief).

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

Plaintiff M.A. appeals from the June 11, 2025 Family Part order denying her application for a final restraining order (FRO) against defendant J.H.M. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:15-17 to -35. She also appeals from the court's June 24, 2025 order denying a stay pending appeal. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We summarize the facts and procedural history from the record. Plaintiff and defendant were married in February 2019. The parties have a child, R.G., born in September 2022. In January 2023, the parties separated and thereafter, plaintiff initiated divorce proceedings.

On August 8, 2023, plaintiff obtained a temporary restraining order (TRO) alleging defendant committed acts of domestic violence. She alleged the predicate acts of harassment, N.J.S.A. 2C:33-4, and stalking, N.J.S.A. 2C:12-10. Plaintiff amended the TRO, adding prior acts of domestic violence. The TRO was later transferred to Passaic County, as the parties' pending matrimonial action (FM) was there. On December 7, 2023, plaintiff again amended the TRO, alleging that on July 26, 2023, defendant violated the TRO by attempting to

contact her through the cell phone application, WhatsApp. She noted that the Passaic County Prosecutor's Office dismissed the contempt charge.

A Passaic County trial judge initially began an FRO hearing but determined it was necessary to transfer the matter to the trial court handling the parties' divorce action. After the case was transferred, the court presiding over the FM matter held an FRO trial spanning several days.

On December 11, 2023, the first day of trial, plaintiff moved to admit video-recorded evidence of defendant allegedly threatening to shoot a process server with a handgun. After defendant objected, the court ordered the parties to file briefs on the admissibility of evidence involving defendant's alleged bad acts against a third party.

Thereafter, plaintiff presented the testimony of A.G., a registered nurse. A.G. worked with plaintiff, an attending doctor, at University Hospital. He recalled answering the hospital's "landline phone" on July 5, 2023, while working in the medical intensive care unit (ICU), and that a male caller asserted he was a patient looking to speak with the attending doctor. A.G. stated the caller provided a different name than "the caller ID on the phone." A.G. told plaintiff about the call and observed that once plaintiff "spoke[,] the caller hung up."

3

A.R., plaintiff's brother, testified that defendant was his brother-in-law. On July 4, 2023, while a passenger in a vehicle driven by his wife near his parents' house, A.R. noticed a vehicle speeding. When the car passed by, his wife "had to swerve to avoid" a collision and A.R. "made eye contact" with the other driver, realizing it was defendant. A.R. was concerned that defendant was on the street near his parents' house. On cross-examination, A.R. conceded neither he nor plaintiff called the police.

Plaintiff testified she was a "critical care and pulmonary physician" and worked at University Hospital in July 2023. On July 5, 2023, she recalled working in the ICU and emergency room, which were "very busy." Plaintiff remembered seeing A.G. answer the phone and appear "concerned." After placing the call on hold, A.G. advised plaintiff that the caller stated his name was "James Addison," and he was "a patient of [plaintiff's] from a year ago and . . . want[ed] to speak to [her]." Plaintiff looked at the phone at about 9:16 p.m., read the name "[H.M.] on the caller [ID]," and recognized the number was defendant's father. She felt scared, went to another area, took a picture of the caller ID, and "put her phone on record" before answering the call. Once plaintiff said, "hello," she allegedly heard defendant say "eh" and defendant's mother ask, "did she hang up?" Plaintiff testified that she thought defendant

A-3716-24

may be in front of her parents' house with "an AR-15 pointed at [her] son's window . . . about to shoot." Plaintiff reported the phone call to the police.

Plaintiff also recalled that on July 4, 2023, the day prior, at about 11:00 a.m., she was at her parents' house when A.R. and her sister-in-law told her defendant drove nearby. Following their conversation, plaintiff viewed the house's security camera footage and observed that at 11:17 a.m., defendant was "speeding in front of the house." She explained the house was on a "dead end" street and she felt scared.

After plaintiff began to testify about defendant's alleged aiming of a gun at a process server at the marital residence on April 28, 2023 (process server incident), defense counsel objected. The court observed plaintiff had previously requested a TRO regarding the process server incident, but a different court denied the application. The parties stipulated to removing the process server incident as a predicate act in the TRO and that the allegation would be included in the TRO's prior history section, subject to the court's admissibility determination. The court adjourned further testimony, permitting the parties to brief the issue.

Defendant thereafter made an oral application for parenting time, noting there was a pending FM motion for supervised parenting time. The court granted

defendant parenting time with R.G. on Sundays from 2:00 p.m. to 5:00 p.m. The court amended the TRO, moving the process server incident to the prior history section and granting defendant parenting time with R.G.

Thereafter, plaintiff filed an order to show cause (OTSC) under the FM matter seeking a stay of parenting time, which the court denied. On December 15, 2023, we granted plaintiff's emergent application seeking leave to appeal from the court's order denying a stay of parenting time. After we denied leave to appeal, the Supreme Court granted plaintiff's emergent application for relief. On January 9, 2024, the Supreme Court ordered "that plaintiff's emergent request for a stay of parenting time [wa]s granted" pending the "expeditious[]" resolution of the FM and domestic violence matters.

On January 26, 2024, the court heard argument on the admissibility of evidence surrounding defendant's alleged actions regarding the process server incident. Plaintiff argued the marital residence's doorbell camera video recorded that "a process server [went] to the front door" of the residence. Thereafter, defendant exited "out the side door, point[ed] a loaded gun at the process server[,] and threaten[ed] to . . . shoot him . . . as a trespasser." Plaintiff argued defendant's actions towards a third party were relevant for the context of the parties' domestic violence history and to show that defendant was "unhinged."

6

She conceded defendant had never "pointed a gun at her" nor "threatened to shoot her."

Defendant argued the video and testimony regarding the process server incident were not relevant to the FRO proceedings. Specifically, he contended the information was not admissible under N.J.R.E. 403 or N.J.R.E. 404(b). Defendant asserted that while a prior domestic violence history between the parties may be admissible under N.J.S.A. 2C:25-29(a)(1) through (6), a bad act involving a third party was not admissible as a "prior history of domestic violence." He asked the court to find the evidence inadmissible because "pointing an alleged firearm at another individual" is not "similar in nature or kind to [the alleged]" predicate acts from July 4 and July 5, 2023, involving a "drive-by" and "phone call."

The court denied the admission of the video recording and related testimony regarding the process server incident, finding under N.J.R.E. 403 that "the value of the videotape and the testimony regarding the contents of that videotape would be outweighed by the substantial prejudice to" defendant if admitted. However, the court permitted plaintiff to testify about defendant's criminal charges from the incident, subject to defendant's objection.

On February 28, 2024, plaintiff continued her testimony. She produced the photograph taken on July 5, 2023 of the hospital phone's caller ID that read "[H.M.]" Her audio recording of the call was played for the court. In the audio recording, plaintiff said, "Hello," and a person plaintiff alleged was defendant responded, "Heh." Plaintiff next said, "Hello" a second time and a woman plaintiff alleged was defendant's mother asked, "Did she hang up?" Thereafter, plaintiff alleged he replied, "Yeah." Plaintiff asserted she had never received any phone calls at work and was therefore alarmed by the call.

Regarding the parties' prior history, plaintiff alleged that when she was pregnant in 2022, defendant "would[ not] let [her] sleep inside [their] bedroom" because she "moved too much." Plaintiff also asserted defendant would comment about her weight, "say [she] walk[ed] like an animal," and "make fun" of "red spots on [her] face." Further, plaintiff alleged defendant would "yell" at her for going in the basement near his "armory."

She testified that in January 2023, defendant told her in a conversation he "want[ed] a divorce" and began "throwing things at [her]." The same day, defendant drove plaintiff and their son to her parents' house and left them there. She recounted that during their last few months together, defendant would yell at her and "threaten[] to rape" and slap her, leaving her feeling "scared."

8

Plaintiff played for the court a recorded portion of the parties' conversation on the day she left the marital residence. In the audio recording, plaintiff told defendant that he had "threatened multiple times to rape" and "slap [her]." Defendant responded "that was foreplay." Plaintiff also asserted defendant would come near her and R.G. "testing holsters . . . on his ankle, [and] on his thigh" with weapons and she later learned he had weapons charges.

On April 5, 2024, on cross-examination, plaintiff was asked whether the parties were "into any weird foreplay that involved rape" and she stated that "[defendant] was." Plaintiff was then asked to view a photograph and advise if she was the woman pictured naked and restrained. She advised she could not identify the person in the photograph but later stated, "There was no sex. We just took th[e] pictures." She also denied participating in acts of bondage, discipline, dominance, and submission. Regarding defendant's alleged rape threats, plaintiff admitted on cross-examination that she sent defendant a text message stating, "My husband takes such good care of this p**sy and ass. He made me a slut, and always wanting this p**sy open, wet[,] and slammed into." She also admitted sending defendant a message about rape. She maintained the messages were "a joke." Plaintiff later admitted that she was the woman pictured naked and restrained.

9

Regarding defendant's driving near her parents' home on July 4, 2023, plaintiff conceded the landscaper for the marital residence lived two houses away, but she maintained defendant never delivered checks to the landscaper. Regarding the July 5, 2023 phone call, plaintiff maintained she was "terrified" but was able to compose herself to take a picture of the caller ID and coordinate recording the phone call. Plaintiff further admitted calling defendant back multiple times on the same night, on his father's phone number, despite her alleged fear of defendant. She acknowledged defendant was permitted to call her. Regarding defendant's use of firearms, plaintiff conceded shooting firearms with him at least once. On redirect, plaintiff reiterated her fear of defendant.

On April 29, 2024, plaintiff called defendant as a witness. Defense counsel objected, stating defendant had the absolute "right to remain silent" and would not testify. Plaintiff's counsel argued defendant had no "right to assert a blanket privilege to not testify as to other aspects of the marriage." The court ruled defendant "ha[d] to take the stand, take the oath[,] and assert his [Fif]th Amendment right." After defendant took the witness stand, plaintiff's counsel asked if he was married to plaintiff and defendant "ple[d] the Fifth." Defense counsel advised the court defendant would assert his Fifth Amendment right to every question asked and that defendant was seeking a stay to appeal. The court

then ruled it was "requir[ing]" defendant "to answer" plaintiff's counsel's questions because the questions asked "thus far" did not make defendant "susceptible to waiving his Fifth Amendment right against self-incrimination." Further, the court determined it could draw an adverse inference. The court granted defendant a stay of the trial pending appeal.

After we denied defendant's motion for leave to appeal, the Supreme Court granted leave to appeal, reversing the trial court and remanding for further proceedings. M.A. v. J.H.M., 260 N.J. 522 (2025). The Court held "that although the Fifth Amendment does not afford a defendant in a PDVA FRO hearing blanket immunity, a defendant may invoke the privilege against self-incrimination in response to specific questions that raise reasonable risks of self-incrimination." Id. at 527. The Court explained "that no adverse inference may be drawn from the exercise of that right." Ibid. Further, the Court held "the PDVA immunity provision contained in N.J.S.A. 2C:25-29(a) is not coextensive with the privilege against self-incrimination and is therefore insufficient to safeguard a defendant's rights under the Fifth Amendment." Id. at 528-29.

After the remand, the court resumed the trial. Defendant testified that the parties were married and separated in January 2023. He also confirmed writing checks to the landscaping company and stipulated to driving by plaintiff's house.

11

At the conclusion of plaintiff's case-in-chief, defendant moved for an involuntary dismissal of plaintiff's TRO pursuant to Rule 4:37-2(b). Defendant argued, if the court accepted all of the facts and inferences in plaintiff's favor, dismissal was warranted because she failed to establish the elements of the predicate acts of harassment and stalking. Defendant also asserted plaintiff failed to establish a need for protection. Plaintiff responded that dismissal was inappropriate because defendant's actions on July 4 and July 5, 2023 must be viewed in the context of the parties' relationship and she is afforded all favorable inferences. Plaintiff argued the elements of harassment under N.J.S.A. 2C:33-4(a) were met and there was "more than one" act to satisfy stalking, N.J.S.A. 2C:12-10. Plaintiff maintained that in addition to making a prima facie showing of the predicate acts, she sufficiently showed a need for protection.

In its oral decision, the court recognized a motion for involuntary dismissal, Rule 4:37-2(b), required a determination of whether plaintiff "presented a prima facie case that an act of domestic violence ha[d] occurred" and the FRO was "necessary to protect" plaintiff "from future acts of domestic violence." The court noted the heart of the issue was whether plaintiff established sufficient evidence to satisfy the elements of the predicate acts of harassment and stalking based on defendant's actions on July 4 and July 5, 2023.

The court accepted plaintiff's and A.R.'s testimony that defendant was speeding when he drove in front of plaintiff's parents' house. The court noted plaintiff "had not witnessed" defendant driving but viewed it on security camera footage. It found it relevant that "nothing prevent[ed] . . . defendant from . . . driving past [plaintiff's parents'] house."

The court also accepted that defendant called plaintiff at the hospital at night while using another name. Regarding defendant's phone call, the court found it "most dispositive," that "plaintiff could not establish that . . . [d]efendant made this call with the intent to make or cause to be made a communication or communications anonymously since there was a caller [ID]," or that it was "at extremely inconvenient hours since it was 9[:00] p.m." The court noted plaintiff testified she was "terrified" by defendant's phone call, but she had admitted on cross-examination that she "call[ed] back the phone number" multiple times. Further, it determined there was no "offensively coarse language, [as] [plaintiff] only heard him say uh" nor was the call made "in any other manner likely to cause annoyance or alarm in violation of N.J.S.A. 2C:33-4(a)." The court reasoned that "nothing prevent[ed] . . . defendant from calling her or driving past her [parents'] house." Because plaintiff failed to establish a

prima facie showing that defendant intended to cause "annoyance, alarm, or fear," the court determined plaintiff did not prove the elements of harassment.

Regarding the predicate act of stalking, the court found plaintiff failed to "establish a prima facie showing that on two or more occasions, namely" July 4 and July 5, 2023, that "[d]efendant purposely or knowingly engaged in a course of conduct, as defined by the statute, that was directed at her that would make a reasonable person fear for her safety or the safety of a third person, or suffer any other emotional distress in violation of N.J.S.A. 2C:12-10."

While the court found no prima facie showing "of a predicate act of domestic violence," it nonetheless considered plaintiff's alleged history of domestic violence, noting that harassment must be "viewed within a context of the [parties'] history."  It found plaintiff's assertions that defendant would not "rub her back," made her sleep in a "guest room because she moved too much," "comment[ed] about her weight," and yelled at her not to go near his armory were "domestic contretemps leading up to the separation and subsequent divorce."  Regarding plaintiff's serious allegations that defendant threatened to rape and slap her, the court stated it placed no "significant weight on these allegations" because the evidence showed they engaged in consensual texting about the word "rape" and plaintiff admitted the word was used "as a joke" at

times. Further, the parties' "explicit photos" provided context to their consensual relationship.

The court further found plaintiff did not sufficiently show defendant threatened her with a firearm, noting it was undisputed defendant was always a gun owner, he enjoyed going to the gun range, and plaintiff went shooting with him. Regarding the charges related to the process server incident, the court was unpersuaded that defendant's weapons charges supported plaintiff's alleged fear for her safety. The court stated it was "not persuaded . . . [p]laintiff . . . made a prima facie showing that [an FRO was] . . . necessary to protect her from future acts of domestic violence, or that . . . [d]efendant's actions ha[d] caused . . . [p]laintiff to reasonably fear for her safety." Plaintiff moved for a stay of the dismissal of her TRO pending appeal, which the court denied.

On appeal, plaintiff contends the court: erred in dismissing plaintiff's TRO at the conclusion of her case-in-chief; improperly excluded key evidence and relied on defense counsel's narrative in violation of due process; misapplied the Supreme Court's decision regarding the invocation of the Fifth Amendment privilege; and failed to maintain control of the courtroom and demonstrated judicial bias against plaintiff.

II.

Our review of an FRO issued after a bench trial is limited. T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise . . . .'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). Trial court findings are "binding on appeal when supported by adequate, substantial, credible evidence." G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We, however, review de novo a trial judge's legal conclusions. C.C., 463 N.J. Super. at 429.

We review a trial court's decision on a motion for involuntary dismissal pursuant to Rule 4:37-2(b) by applying the same standard as the trial court. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016); see ADS Assocs.

16

Grp. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). "A motion for involuntary dismissal is premised 'on the ground that upon the facts and upon the law the [non-moving party] has shown no right to relief.'" ADS Assocs. Grp., 219 N.J. at 510 (quoting R. 4:37-2(b)). The motion must be denied "[i]f the court, 'accepting as true all the evidence which supports the position of the [non-moving party] . . . and according him [or her] the benefit of all inferences which can reasonably and legitimately be deduced therefrom,' finds that 'reasonable minds could differ.'" Id. at 510-11 (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). However, an involuntary "'dismissal is appropriate when no rational [factfinder] could conclude from the evidence that an essential element of the plaintiff's case is present.'" Perez v. Professionally Green, LLC, 215 N.J. 388, 407 (2013) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:37-2(b) (2013)).

The New Jersey Legislature enacted the PDVA "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. The PDVA defines a "[v]ictim of domestic violence" as "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d); R.G. v. R.G., 449 N.J. Super. 208, 219-20 (App. Div. 2017) (recognizing the amended

17

definition of "[v]ictim of domestic violence" evinced "the Legislature's intent to broaden the application" of the PDVA).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, "the [court] must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The court is also required to consider "any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination." Cesare, 154 N.J. at 403. "'A single act can constitute domestic violence for the purpose of the issuance of an FRO,' even without a history of domestic violence." C.C., 463 N.J. Super. at 434-35 (quoting McGowan v. O'Rourke, 391 N.J. Super. 502, 506 (App. Div. 2007)).

Second, if a predicate act is proven, the court must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further acts of abuse. Silver, 387 N.J. Super. at 127. A previous history of domestic violence between the parties is one of six non-exhaustive factors a court is to consider in evaluating whether a restraining order is necessary to

18

protect the plaintiff. N.J.S.A. 2C:25-29(a)(1); see also D.M.R. v. M.K.G., 467 N.J. Super. 308, 324-25 (App. Div. 2021) (holding whether a court should issue a restraining order depends, in part, on the parties' history of domestic violence).

Harassment, N.J.S.A. 2C:33-4, is a predicate act of domestic violence enumerated under the PDVA. N.J.S.A. 2C:25-19(a)(13). Under N.J.S.A. 2C:33-4(a), a person commits harassment "if, with purpose to harass another, he [or she] . . . [m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(c) further provides that a person commits harassment if he or she "[e]ngages in . . . [a] course of alarming conduct or . . . repeatedly committed acts with purpose to alarm or seriously annoy . . . [another] person." To commit harassment, a defendant must "act with the purpose of harassing the victim." D.M.R., 467 N.J. Super. at 323. "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties, . . . that finding must be supported by some evidence that the actor's conscious object was to

alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citation omitted).

In accordance with the stalking statute, N.J.S.A. 2C:12-10(b):

> [a] person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

The stalking statute additionally provides the following definitions:

> (1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly or indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats[,] or threats conveyed by any other means of communication[,] or threats implied by conduct of a combination thereof directed at or toward a person.
>
> (2) "Repeatedly" means on two or more occasions.
>
> (3) "Emotional distress" means significant mental suffering or distress.
>
> (4) "Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.
>
> [N.J.S.A. 2C:12-10(a).]

## III.

### A. Dismissal of the TRO.

Plaintiff contends the court erred in dismissing her TRO because the evidence was not reviewed "in the light most favorable to her." She asserts the court improperly focused on her credibility and did not afford all legitimate inferences from the evidence. Further, plaintiff argues the court erroneously relied on the "nude photographs" of her and "sexually explicit communications" that were never "admitted into evidence."

In evaluating whether to dismiss plaintiff's TRO pursuant to Rule 4:37-2(b), the court considered all of plaintiff's evidence and the legitimate reasonable inferences drawn therefrom in determining she failed to make a prima facie showing of harassment and stalking. The court accepted that defendant had driven by plaintiff's house and called plaintiff at the hospital. The court determined there was insufficient evidence to satisfy the first Silver prong, as plaintiff had failed to show, "by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] ha[d] occurred." 387 N.J. Super. at 125.

Regarding the July 4, 2023 incident, the court reasoned defendant was not legally barred from driving by where plaintiff was residing. While plaintiff had

learned from A.R. that defendant drove by her parents' home, the court found "defendant's specific intent to cause annoyance, harm, or fear" was "absent from the evidence." The record supports that plaintiff failed to demonstrate sufficient facts to support defendant drove to the residence with a purpose to harass her under N.J.S.A. 2C:33-4(a) or (c).[2]

The court also determined plaintiff failed to establish facts supporting that defendant's call from his father's phone number to her at work was anonymous, at an extremely inconvenient hour, or made to annoy or alarm her. The court emphasized that defendant was permitted to call plaintiff. The court noted plaintiff testified she said, "hello two times," heard defendant say, "eh" and defendant's mother ask him if plaintiff had hung up, and the call then disconnected. Relevantly, plaintiff admitted to trying to call defendant back multiple times. Viewing the facts in the light most favorable to plaintiff, the court determined she failed to demonstrate defendant's call was made with the purpose to harass her. After a review of the record, we discern no basis to disturb

---

[2] We note the record indicates plaintiff argued the predicate act of harassment was established under N.J.S.A. 2C:33-4(a). The court's opinion provides findings that track the elements of subsection (a) of the harassment statute, and it also considered the elements of subsection (c). Cf. State v. Pillot, 115 N.J. 558, 566 (1989) (upholding a court's sentence because it was "possible in the context of this record to extrapolate without great difficulty the court's reasoning").

the court's finding that plaintiff failed to demonstrate evidence supporting the phone call satisfied the elements of harassment. N.J.S.A. 2C:33-4(a), (c).

Regarding the predicate act of stalking, the court also found plaintiff failed to establish facts to support defendant "purposefully or knowingly engage[d] in a course of conduct directed at" her "that would cause a reasonable person to fear for his[ or her] safety . . . or suffer other emotional distress." N.J.S.A. 2C:12-10(b). Specifically, the court found plaintiff failed to make a "prima facie showing that on . . . July 4[] and July 5[, 2023,] . . . defendant purposely or knowingly engaged in a course of conduct, as defined by the statute." While plaintiff has not specifically addressed the predicate act of stalking, we have considered the court's findings that plaintiff failed to establish sufficient facts to support the required elements. Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 381 N.J. Super. 119, 127 (App. Div. 2005) (providing that courts are not "obliged to attempt review of an issue when the relevant portions of the record are not included"); see also R. 2:6-2(6). After a review of the record, we discern no bases to disturb the court's determination.

We also reject plaintiff's contentions that reversal is warranted because the court dismissed her TRO based on unsupported credibility determinations

23

against her and improperly considered nude photographs, sexually explicit communications, and defendant's altered evidence not admitted at trial. The record demonstrates the court did not rest its decision on plaintiff's credibility. In considering "the second prong of Silver," the court specifically noted it did not need to address plaintiff's credibility "in light of . . . [her] failure to make a prima facie showing that a predicate act of domestic violence has occurred." Further, because the court properly determined that plaintiff failed to establish the alleged predicate acts, we need not address plaintiff's arguments regarding the evidence admitted as to her asserted prior domestic violence history. We only add that we discern no error in the court's admission of evidence as relevant to plaintiff's allegations.

In sum, the court's determination that plaintiff failed to demonstrate sufficient evidence to satisfy the elements of the predicate acts of harassment and stalking is amply supported by the record. See Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008). For these reasons, we reject plaintiff's argument that the court erred in dismissing her TRO under Rule 4:37-2(b).

## B. Excluded Evidence.

Plaintiff next contends the court erred in excluding key evidence at trial warranting reversal. She asserts the "Ring and bodycam recordings from the" process server incident were wrongly excluded. Plaintiff argues the evidence was admissible as "the best evidence under [N.J.R.E.] 1002" and relevant to provide context regarding her "fear for her safety."

The court determined the evidence surrounding defendant's alleged criminal conduct against the process server was inadmissible under N.J.R.E. 403. The court found relevant that the evidence did not involve plaintiff but an alleged bad act against a third party. We "typically review evidentiary rulings under a deferential standard and will 'uphold [the trial court's] determinations absent a showing of an abuse of discretion.'" State v. Trinidad, 241 N.J. 425, 448 (2020) (alteration in original) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). We defer to the court's evidentiary rulings unless they were "so wide of the mark that a manifest denial of justice resulted." State v. Gonzalez, 249 N.J. 612, 633 (2022) (quoting State v. Singh, 245 N.J. 1, 13 (2021)).

In addressing the admissibility of a party's other bad acts or wrongs, we have held that "[a]lthough N.J.S.A. 2C:25-29(a)(1) permits the introduction of evidence of the defendant's 'previous history of domestic violence,' it does not

authorize introduction of evidence regarding a defendant's past altercations with others." R.G., 449 N.J. Super. at 222 (emphasis added). The parties' domestic violence history may be admissible under the statute "'[b]ecause a particular history can greatly affect the context of a domestic violence dispute.'" Ibid. (quoting Cesare, 154 N.J. at 405). "Any other evidence presented must meet the test for admission as provided by our Rules of Evidence." Ibid.

In considering the admissibility of evidence involving other crimes or wrongs pursuant to N.J.R.E. 404(b), the court must determine whether the factors set forth in State v. Cofield are met. 127 N.J. 328 (1992). The Supreme Court explained that courts must analyze whether:

> (1) The evidence of the other crime must be admissible as relevant to a material issue;
>
> (2) It must be similar in kind and reasonably close in time to the offense charged;
>
> (3) The evidence of the other crime must be clear and convincing; and
>
> (4) The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Id. at 338.]

We discern no abuse of discretion by the court in determining video evidence and testimony regarding defendant's alleged misconduct and criminal

A-3716-24

acts against a process server were inadmissible. The court's finding that the probative value was substantially outweighed by the prejudice to defendant is sufficiently supported. Moreover, plaintiff failed to meet the first prong of Cofield as she failed to show the evidence being offered was material to her alleged predicate acts or domestic violence history. Thus, there is no reason to disturb the court's exclusion of the evidence.

We also reject plaintiff's assertion that the court erroneously excluded the Ring video evidence from July 10, 2023, which purportedly showed defendant paying the marital residence landscaper for work done, that she sought to admit during her direct examination of defendant. Notably, defendant had invoked his Fifth Amendment right regarding testimony surrounding the July 4, 2023 incident. As the court correctly noted, the evidence related "to the predicate act," and defendant thereafter stipulated that he drove by plaintiff's parents' house. The court appropriately barred plaintiff from seeking defendant to testify as to who was depicted in the video. The court's finding that defendant's Fifth Amendment "assertion [wa]s proper, and" its determination to "not draw a negative inference" are sufficiently supported.

A-3716-24

C. Fifth Amendment Privilege.

Plaintiff asserts the court misapplied the Supreme Court's holding regarding defendant's Fifth Amendment privilege. See M.A., 260 N.J. at 522. Plaintiff maintains the court improperly permitted defendant to assert his right against self-incrimination regarding his actions on July 4, 2023 and "did not take a negative inference." She posits there was "no possible consequence . . . enabl[ing] him to exert the" privilege. Further, she challenges defendant's assertion of his Fifth Amendment privilege when asked about lawfully possessing firearms.

Plaintiff's contentions are unavailing as defendant was permitted to invoke his Fifth Amendment right when asked about issues relating to the alleged predicate acts and pending criminal matter involving the process server. The Supreme Court held "that in PDVA FRO hearings, the court may not draw an adverse inference against a defendant for invoking the privilege against self-incrimination when refusing to answer a specific question that reasonably raises the risk of self-incrimination." Id. at 539. The Supreme Court recognized defendant's right to assert his Fifth Amendment privilege based on his "exposure to prosecution . . . related to the separately pending weapons charge" as well as "the predicate acts underlying the domestic violence allegations." Ibid. For

these reasons, we conclude the court correctly determined defendant was permitted "to refuse to answer," and it was not permitted to "draw an adverse inference." Id. at 541.

### D. Courtroom Conduct and Judicial Bias.

We finally address plaintiff's assertion that she was prejudiced by the court's failure to maintain control of the courtroom. Relatedly, plaintiff also contends defense counsel's misconduct constitutes plain error. She argues the court demonstrated bias by making "inconsistent rulings with respect to the [p]arties," "permit[ting] [defense counsel's] continuous interruptions," and applying "tight scrutiny of [p]laintiff's exhibits versus indulgence of [d]efendant's edited materials."

"In our judicial system, the trial court controls the flow of proceedings in the courtroom." State v. Jones, 232 N.J. 308, 311 (2018). "As a reviewing court, we apply the abuse of discretion standard when examining the trial court's exercise of that control." Ibid.

From the outset, after a review of the trial transcripts, we agree with plaintiff's assertion that defense counsel engaged in "derisive commentary." Defense counsel's conduct during the trial was at times inappropriate and unprofessional. See RPC 3.4 and 3.5. By example, multiple times during the

proceedings, the court had to instruct defense counsel to "avoid theatrics," "be mindful of . . . [his] demeanor when questioning the witness," and stop the inappropriate "exchange between counsel." The record reflects the court appropriately addressed that defense counsel's inappropriate facial expressions and comments, including "[w]e are going to get rattled in a second," the court was "going to allow this . . . back-door circus," and he had "no shame . . . because . . . [a]nybody can get mad at [him]." Further, the court addressed plaintiff's behavior and directed her multiple times on cross-examination "to listen to the questions and respond to the questions" asked because she was unresponsive.

During this contentious trial, the court also properly addressed every objection by counsel and instructed the parties and counsel to abide by the court rules. The court "exercise[d] reasonable control over the mode and order of interrogating witnesses and present[ation of] evidence." N.J.R.E. 611(a). The court was mindful during this bench trial of its gatekeeping role and directed the parties and counsel to conduct themselves appropriately. We discern no prejudice by the court or a plain error warranting reversal.

We conclude the court committed no error in permitting defense counsel to cross-examine plaintiff regarding her assertions that defendant had threatened

to rape and slap her. Plaintiff's allegations "opened the door" to questions on cross-examination about the sexually explicit text messages sent to defendant and her consensual sexual activities of being photographed naked and physically restrained. The court instructed defense counsel to be mindful that the issues were "very sensitive" and "[r]egardless of" plaintiff's allegations or the defense, "it[ was] still a very personal, private, [and] intimate issue." The court's instructions were properly given to "protect [plaintiff] from harassment or undue embarrassment." N.J.R.E. 611(a)(3).

We also reject plaintiff's contention that the court erred in permitting plaintiff to read aloud her own text messages because they were humiliating. "[T]he '"opening the door doctrine" is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.'" State v. Vandeweaghe, 177 N.J. 229, 237 (2003) (quoting State v. James, 144 N.J. 538, 554 (1996)) (emphasis omitted). Based on plaintiff's allegations, the court properly permitted defendant fair examination of the parties' consensual sexual activities and plaintiff's text messages demonstrating her participation, which were introduced to refute her testimony, and the audio recording of defendant's

alleged rape and slapping threats. We are convinced the court did not abuse its discretion in determining the evidence had "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401.

We also discern the court demonstrated no bias against plaintiff and provided her with a full and fair opportunity to present her case. "A litigant in civil proceedings is entitled to a fair hearing, imbued with the protections of due process." D.N. v. K.M., 429 N.J. Super. 592, 602 (App. Div. 2013) (citing A.B. v. Y.Z., 184 N.J. 599, 604 (2005)). "Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner." Thomas Makuch, LLC v. Township of Jackson, 476 N.J. Super. 169, 187 (App. Div. 2023) (quoting Doe v. Poritz, 142 N.J. 1, 106 (1995)). "Additionally, due process protections encompass 'procedural safeguards[,] including the right to cross-examine adverse witnesses and the right to call witnesses.'" In re Adoption of Child ex rel. M.E.B., 444 N.J. Super. 83, 88-89 (App. Div. 2016) (quoting Peterson v. Peterson, 374 N.J. Super. 116, 124 (App. Div. 2005)). The court permitted the parties ample opportunity to present admissible evidence. Plaintiff's assertions of bias are directly contradicted by the record.

A-3716-24

To the extent not addressed, plaintiff's remaining contentions lack sufficient merit to warrant discussion in our written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division